# Illinois Official Reports

## Appellate Court

---

***People v. Holman*, 2014 IL App (3d) 120905**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EXULAM HOLMAN, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-12-0905 |
| Filed | October 8, 2014 |
| Rehearing denied | November 10, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed defendant's conviction for aggravated domestic battery and his sentence to the maximum term of 14 years in prison based on an incident in which he fought with his uncle and pressed his thumbs into his uncle's eyes, causing his uncle to have one eye removed and to basically lose his sight in the other eye, since the uncle was much smaller and older than defendant, and even if the uncle started the fight, defendant's response was so excessive and deadly that it could not be a legally justified use of force in self-defense, the gouging of the uncle's eyes was exceptionally brutal or heinous behavior indicative of wanton cruelty that would qualify defendant for an extended term, and the extent of the great bodily harm and permanent disability inflicted on the uncle went beyond what was necessary to sustain a conviction for aggravated domestic battery; furthermore, the trial court did not consider an improper factor when it considered the harm inflicted in imposing a sentence and there was no indication the trial court ignored any mitigating factors in making its sentencing decision. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 12-CF-29; the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Emily E. Filpi (argued), both of State Appellate Defender's Office, of Chicago, for appellant.

James Glasgow, State's Attorney, of Joliet (Robert M. Hansen (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justices O'Brien and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, defendant, Exulam Holman, was convicted of aggravated domestic battery (720 ILCS 5/12-3.2(a)(1), 12-3.3(a) (West 2010)) and was sentenced to 14 years in prison. Defendant appeals, challenging both his conviction and his sentence. We affirm the trial court's judgment.

¶ 2                                      FACTS

¶ 3    On December 31, 2011, defendant was arrested and charged with one count of aggravated domestic battery and one count of aggravated battery for allegedly pressing his thumbs into his uncle's eye sockets during a fight between the two on New Year's Eve. Defendant's uncle was severely injured as a result of the incident, had to have one of his eyes removed, and lost most of the vision in his other eye. Defendant's case proceeded to a jury trial in August 2012. The evidence presented at trial can be summarized as follows.

¶ 4    Defendant's uncle, Clifford Melvin, testified for the State (and later as a defense witness) that he was born in April 1949 and was 63 years old as of the date of trial. Melvin was in the Army from 1967 to 1970 and saw active duty in both Korea and Vietnam. As part of his early Army combat training, Melvin was trained in the use of judo and was taught how to use his hands and feet as weapons. Melvin was proud of his Army service and his family knew that he had served in the military. In 1995, Melvin was hit by a car and sustained numerous injuries. As a result of that accident, Melvin was left with no strength in his right hand or his right side. In December 2011, Melvin was living in the basement of his sister's residence on McKay Street (the McKay Street residence) in Joliet, Illinois. Also living at the residence was Melvin's sister, Nannetta Johnson; her husband, Michael; defendant, who was Nannetta's son and Melvin's nephew; two of Melvin's great nieces; and one of Melvin's great nephews. Melvin was about 5 feet 3 inches tall and weighed about 147 pounds, and defendant was about 5 feet 9 inches or 5 feet 10 inches tall and weighed considerably more than Melvin.[1]

_____

[1]The presentence investigation report that was filed in this case indicates that defendant was 5 feet 7 inches tall and that he weighed 280 pounds. Although that specific information was not before the jury, the jury would have been able to see defendant's physical characteristics at trial.

¶ 5        On the evening of December 31, 2011, New Year's Eve, Melvin went to one of the gambling boats in Joliet at about 8:15 p.m. to meet a friend. That person did not show up, but Melvin ran into another friend at the boat. Melvin and his friend walked around for a while and had something to eat. Melvin had some drinks that day but was careful about what he drank because he was on medications and because he had been told by his doctors not to drink excessively since he had a prior history of blacking out when he did so. According to Melvin, the doctor had told him that it was permissible for him to have a shot or a beer after 3 p.m., even though he was on daily medications. Melvin had not, however, taken his daily medicines on New Year's Eve or the day before because he knew that he was going to be drinking a little bit and he did not want to put extra stress on his liver. Melvin had a shot and a beer at noon that day at a friend's house and had another shot and a beer at about 8:30 p.m. at the gambling boat, while he was waiting for his friend to arrive. According to Melvin, he was not intoxicated when he was at the boat. Melvin left the boat at about 10 p.m., and his friend gave him a ride home.

¶ 6        When Melvin got to the residence, there were other people there, celebrating the holiday. Melvin went into the house through the side door. Inside that door was a landing with two flights of stairs. One flight went down to the basement; the other went up to the kitchen. Melvin went down the stairs to his bedroom in the basement. As he was getting ready for bed, Melvin heard defendant upstairs in the kitchen. Melvin went upstairs to "get on" defendant because he thought that defendant had taken the remote control for his DVD player. Melvin was going to tell defendant that he wanted the remote control back or that he was going to call the police.

¶ 7        When Melvin walked into the kitchen, defendant was seated at the table with Michael's son, Corinthian Baker, and two of Melvin's nieces, Kadijah and Charolyn Holman. Melvin's sister, Nannetta Johnson, was not home at the time. Melvin's brother-in-law, Michael, was home, but he was intoxicated. Melvin confronted defendant about the missing remote control and, as he did so, Charolyn left the kitchen and ran into the front room. The other two stayed in the kitchen. Defendant got up, told Melvin to shut up, shoved Melvin down the stairs, and slammed the door. Melvin fell backwards down the stairs and hit the wall at the landing.

¶ 8        Melvin was angry and came back up the stairs. He tried to go through the door into the kitchen, but the table and chair had been pushed up against the door blocking it. Melvin was able to push the door open and squeeze through. Melvin could not get around the table, so he tried to go over the table to get to defendant because he was mad at defendant. As Melvin went over the table, defendant flipped the table over, and Melvin fell to the floor on his back. Defendant straddled Melvin, pinned Melvin's arms down with his knees, and pressed his thumbs into Melvin's eyes as he stood up with all of his weight. With his thumbs still in Melvin's eyes, defendant stated, "there's only one king," and got off of Melvin.

¶ 9        Melvin eyes were bleeding, he could not see, and he was in a lot of pain. He reached for the phone on the wall to call the police, but defendant grabbed the phone out of his hand and prevented him from getting any closer to the phone. Melvin felt his way down the steps to his bedroom in the basement where his cell phone was located and called 9-1-1. At some point, Melvin passed out. The police arrived, took Melvin upstairs, and asked Melvin to explain to them what had happened.

¶ 10       Melvin was later taken to Silver Cross hospital in the area and was eventually taken to the University of Illinois Hospital in Chicago. He was in and out of consciousness and did not

remember arriving at either hospital. Melvin had two surgeries on his eyes at the hospital in Chicago and a third surgery at the Veterans Administration hospital. Unfortunately, the doctors were unable to save Melvin's left eye and that eye had to be removed. In addition, the sight in Melvin's right eye was limited and he had no depth perception in that eye. At trial, Melvin testified that he could only see out of his right eye if he used the special glasses that had been made for him, and that without the glasses, the vision out of his right eye was blurred, like looking through water. Photographs that were taken in the middle of January 2012 of the condition of Melvin's eyes were admitted into evidence, without objection.

¶ 11        Melvin testified further that he was certain that he was not intoxicated on the night in question and that although he might have smelled of alcohol, he was not slurring his words. Melvin acknowledged that he was uncooperative at the hospital and stated that he was in pain and was trying to get help, but the people at the hospital kept asking him different questions. Eventually, Melvin blacked out at the hospital, not because of the alcohol that he had drank earlier, but because of the medicine he was given to kill the pain. Melvin denied that he ever punched or hit defendant during the confrontation and stated that before he even reached defendant, defendant flipped the table over, and he was on his back. Melvin did not ask Corinthian, Kadijah, or Charolyn for help and did not yell for anyone else in the house to help him. According to Melvin, Corinthian did not try to break up the fight and Melvin never yelled at Corinthian to stay out of it.

¶ 12        Will County Sheriff's Deputy Thomas Omiecinski testified for the State that on December 31, 2011, at about 10:06 p.m., he and Deputy Todd were dispatched to a call at the McKay Street residence. Omiecinski and Todd were in police uniform and were driving marked squad cars at the time. Upon their arrival at the residence a few moments later, the deputies were allowed to enter through the front door. There were multiple people inside the residence and it appeared that there was a New Year's Eve Party in progress. When the deputies asked those present what had happened and why the police were called to the residence, some of the people responded that nothing happened and others simply did not respond.

¶ 13        As the deputies made their way to the kitchen area, Omiecinski heard a person moaning from the basement. Omiecinski started down toward the basement and saw Melvin trying to make his way up the stairs with his hands stretched out in front of him as if for guidance. Melvin asked Omiecinski to help him and told Omiecinski that he could not see. Omiecinski noticed that Melvin's eyes were red, bleeding, and swollen, and that there was blood pouring from Melvin's eyes down onto his cheeks. It appeared to Omiecinski that Melvin's eyes had sustained a major injury as they were protruding about a quarter inch from the sockets. Omiecinski helped Melvin into the kitchen, and Melvin told him what had happened. Omiecinski saw that Melvin needed immediate medical attention and asked for the paramedics to come into the residence right away. The paramedics took Melvin to the hospital.

¶ 14        After Melvin left with the paramedics, the deputies tried to make contact with defendant by going to defendant's bedroom on the second floor. They deputies knocked on defendant's bedroom door and announced that they were police officers and that they needed to speak to defendant. Defendant did not answer the door immediately. After several moments, defendant opened the door. Omiecinski asked defendant what had happened, and defendant responded with, "[n]othing, n***," and "s*** happened." Omiecinski did not notice any injuries on defendant and when Omiecinski asked defendant, defendant stated that he was not injured.

Omiecinski and Todd eventually placed defendant under arrest. Because of defendant's large size, the deputies had to use two sets of handcuffs; one was not sufficient.

¶ 15 As Omiecinski and Todd walked through the house, they asked some of the 10 or 15 other people who were present what had happened. Only one person was cooperative. Omiecinski saw that there was a remote control on the floor in the living room, which was near the kitchen. The plastic casing on the remote control had been smashed into several pieces and was lying on the floor. Upon being asked, a household member told Omiecinski that the remote was for the television in the living room.

¶ 16 As a police officer, Omiecinski had been trained in alcohol detection for the purpose of determining if a person was intoxicated or had been drinking. Omiecinski did not notice any smell of alcohol on Melvin or any slurred speech. According to Omiecinski, Melvin was cooperative in answering questions and did not appear to be intoxicated in any way.

¶ 17 Will County Sheriff's Deputy Richard Todd testified for the State and provided a similar account of what had occurred at the McKay Street residence that evening. Todd testified further that he went to the hospital after he left the scene and tried to talk to Melvin. By that time, Melvin had already received some treatment and his eyes were bandaged. Melvin appeared to be in a lot of pain and although he was trying to answer Todd's questions, his responses were inaudible and he was moaning when he was trying to speak. Todd did not, however, notice Melvin lose consciousness or black out at the hospital.

¶ 18 Firefighter/paramedic Matt Bowles testified for the State that on December 31, 2011, he and his partner, Louis Helis, were dispatched to the McKay Street residence at about 10:07 p.m. They arrived at the residence about five minutes later. Upon arrival, after the scene was cleared by the sheriff's deputies, the paramedics went into the house into the kitchen area where the patient, Melvin, was located. As they walked to the kitchen area, the paramedics noticed that there were about 10 or 15 people in the living room of the house, near the kitchen, watching television.

¶ 19 Melvin was sitting at the kitchen table facing the paramedics. He had heavy blood coming from both of his eyes. Melvin's left eye was protruding quite a bit and his right eye was very sunken into his skull. The paramedics checked to make sure that Melvin was alert, conscious, and breathing, and then started wound care. Melvin's head and eyes were wrapped in gauze to keep them sterile and to protect them. After getting Melvin's baseline vital readings, the paramedics put Melvin into the back of the ambulance for transport. As the paramedics were treating Melvin, Bowles did not notice any signs that Melvin was intoxicated. Bowles described Melvin's demeanor as calm and cooperative. When the paramedics got Melvin into the ambulance, they asked him if he had any pain anywhere else besides his eyes, and Melvin responded that he did not have pain elsewhere, but he did fall down the stairs. According to Bowles, Melvin remained conscious the entire time Bowles was with him and did not have any blackouts or losses of consciousness.

¶ 20 Bowles's partner, firefighter/paramedic Louis Helis, provided similar testimony for the State regarding the paramedics' response to the call at the McKay Street residence that evening. Helis described the condition of Melvin's eyes at the scene as severely bleeding and very swollen. Like Bowles, Helis stated that he did not observe any signs that Melvin was intoxicated and did not report to the hospital staff that Melvin had been drinking or that Melvin appeared to be intoxicated.

¶ 21    Dr. Kristin Baier testified for the State that she worked at the University of Illinois Hospital in Chicago as a resident physician in family medicine. Baier was involved in certain aspects of Melvin's treatment at the hospital, including the secondary diagnoses of tobacco and alcohol abuse. Baier saw Melvin at the hospital on January 2 and January 4, 2012. According to Baier, Melvin had a complete loss of vision in his left eye, was only able to detect light in his right eye, and had a fractured cheekbone. During the course of treatment, Baier asked Melvin if he had any alcohol on the day of the incident. Melvin was unable to specify how much alcohol he had drunk but told Baier that he usually did not drink more than one or two drinks at a time and that he was not drunk when the incident occurred. When asked how he sustained the injuries, Melvin told Baier that his nephew pushed him down a flight of stairs and tried to gouge his eyes out.

¶ 22    Dr. Silvio Morales testified for the defense that he was the chairman and medical director of the emergency department at Silver Cross Hospital. Morales performed an examination of Melvin when Melvin was brought into the hospital's emergency department on New Year's Eve. According to Morales, Melvin's cooperation with the examination was limited due to Melvin being intoxicated. Morales's determination that Melvin was intoxicated was based upon his observations of Melvin–that Melvin smelled of alcohol, was unable to fully cooperate with the exam, and had slurred speech–and was not based upon the results of any type of laboratory value. Morales acknowledged during his testimony, however, that he had no direct memory of Melvin and that he could only go by what was contained in his report.

¶ 23    Charolyn Holman testified for the defense that she was Nannetta Johnson's daughter and defendant's sister. During the evening of December 31, 2011, Charolyn was at the McKay Street residence. Charolyn had not been drinking, although she planned to have a drink at midnight to celebrate the new year. Present at the house along with Charolyn was defendant (Charolyn's brother); Melvin (Charolyn's uncle); Kadijah Holman (Charolyn's niece); Montiana (Charolyn's niece); Darzell (Charolyn's nephew); Dominique (Charolyn's step-nephew); Corinthian Baker (Charolyn's stepbrother); Michael Johnson (Charolyn's stepfather); and Charolyn's son. Charolyn's stepfather, Michael, was asleep when the incident in this case occurred.

¶ 24    At some point after about 10 p.m., Charolyn heard Melvin come in through the back door. Charolyn and Melvin had a conversation and then Melvin went downstairs and took his coat off. Melvin came back upstairs, and he and defendant started having words in the kitchen. Charolyn was in the living room, which was down the hall from the kitchen, and could hear a commotion. Melvin and defendant were cussing at each other. Charolyn could see into the kitchen from where she was seated in the living room on the love seat. Charolyn got up and went to the entrance of the kitchen area. Melvin and defendant were still cussing back and forth at each other. Dominique, Corinthian, and Montiana were already in the kitchen, so Charolyn turned around and went back to the living room and sat back down on the love seat. When Charolyn looked back into the kitchen, she saw that defendant was on the floor with Melvin straddling him and that Melvin was striking defendant in the face. Corinthian was trying to break up the fight, but Melvin told him that it had nothing to do with him.

¶ 25    Charolyn stayed in the living room until she heard the kitchen table go across the floor. At that point, she got up and went back to the kitchen and saw that the previous positions had reversed–now Melvin was on his back on the floor, defendant was lying flat on his stomach on top of Melvin, and they were both under the table. Charolyn did not know what Melvin and

defendant were doing under the table and could not see defendant's hands but could hear Melvin and defendant cussing back and forth at each other. Charolyn left the kitchen again and went back to the living room and sat back down on the love seat as Corinthian was again trying to break Melvin and defendant apart.

¶ 26    The squabble continued for a few more seconds and then was done. Charolyn went back to the kitchen and saw Melvin lying on the floor by the refrigerator. Both of his eyes were bleeding, but he was talking. Defendant was standing up. His lip was bleeding and he had blood in his mouth and on his teeth. Defendant tried to talk to Charolyn, but Charolyn told defendant to go wash his mouth out. Although the physical fight was over, defendant and Melvin were still cussing at each other. Charolyn did not think it was necessary to call the police at that time because Melvin eventually got up and went back downstairs and because she did not know the severity of the situation until afterwards when the paramedics came to the house. Charolyn did not at any time see defendant push Melvin down the stairs or push the table over to block Melvin from coming back upstairs.

¶ 27    Defendant had gotten his dog and had gone up to his bedroom to go to sleep. Charolyn did not speak to the paramedics and did not give a statement to the police about what had occurred. At some point, Charolyn went upstairs and talked to defendant through the bedroom door because the police were saying that they were going to kick the door down, if defendant did not open it up. Eventually defendant opened the door, and the police brought him downstairs.

¶ 28    Charolyn spoke to a defense investigator in February 2012 and gave a statement about what she saw on the night of the incident. During her trial testimony, Charolyn denied that she had told the defense investigator that she had never gone into the kitchen during the incident that evening. Charolyn also denied that she had told the investigator that she had glanced away and was not looking into the kitchen until she had heard something.

¶ 29    Charolyn testified further that she did not think that defendant was in danger of losing a limb or of suffering a serious injury during the scuffle. Charolyn was at no point in fear for defendant's life or limbs and never called the police that evening.

¶ 30    Seventeen-year-old Kadijah Holman testified for the defense that on December 31, 2011, she was at the McKay Street residence, her grandmother's house, for New Year's Eve. There were several other relatives present at the residence that evening, including defendant, who was her uncle. At about 10 p.m., Kadijah was sitting in the living room watching television, with her aunt, Charolyn, and her cousin, Montiana, when she saw Melvin attack defendant in the kitchen. According to Kadijah, while defendant was sitting in a chair at the kitchen table, Melvin punched defendant multiple times in the face. Defendant fell out of the chair and onto the floor. Melvin picked up the chair and tried to hit defendant with it, but defendant blocked the chair from hitting him. One of Kadijah's other uncles, Corinthian, tried to break up the fight, but Melvin told him to stay out of it and that it had nothing to do with him. Melvin put the chair down, got on top of defendant, and started punching him again. At that point, Kadijah was in the hallway near the entrance to the kitchen.

¶ 31    Melvin and defendant started "tussling." Defendant ended up on top of Melvin and they were exchanging words. The fight moved from the kitchen table to over by the refrigerator. Corinthian tried to break up the fight again, but Melvin told him to get back. Melvin was on the ground on his back, defendant was lying on top of him with his head matched up with Melvin's, and they were rolling around on the ground. Kadijah did not see where defendant's hands or knees were at that point. Corinthian tried to break up the fight again and he and

Kadijah tried to pull defendant up. Defendant got up on his own and at that point, they just saw blood. Kadijah saw blood coming from defendant's mouth first. Then, when defendant got up and left the area, Kadijah saw that there was still blood on the floor and that it was coming from Melvin's eyes. Kadijah went and told her aunt Charolyn what happened, but Charolyn did not get involved, so Kadijah and some of the others handled it. One of the others brought towels into the kitchen to clean up the blood, and defendant went outside, got his dog, and went upstairs to his bedroom.

¶ 32    At some point later, the police came to the house. Kadijah did not call the police that evening and did not do so because she did not know how serious "it" was. She also did not speak to the police when they got there.

¶ 33    About five days later, Kadijah agreed to make a videotaped statement to the police about the incident, after some detectives had come to her grandmother's house. Kadijah told the police that defendant was trying to hug Melvin, but Melvin did not want to be hugged and went downstairs. When Melvin came back upstairs, he and defendant were arguing back and forth, and defendant called Melvin a "b***." Melvin left to go back downstairs and defendant shut the basement door. As defendant was going down the stairs, defendant called Melvin a "b***" again. At that point, Melvin started punching defendant in the face. Defendant fell on the floor, and Melvin grabbed the chair and tried to hit defendant with it, but defendant blocked the chair. Kadijah never told the police that Melvin got on top of defendant. According to Kadijah, Melvin was on top of defendant at one point during the fight, but she forgot to tell the police that information. Kadijah did tell police, however, that defendant got on top of Melvin and that it looked like defendant was choking Melvin.

¶ 34    Kadijah made another statement to defense investigators in February 2012. In that statement, Kadijah told the investigator that Melvin was on top of defendant punching him. Kadijah also told the investigator that some of her previous statement to the police was inaccurate.

¶ 35    Kadijah stated initially in her trial testimony that she thought defendant was in danger of getting hurt badly during the fight because of Melvin's background. The punches that Kadijah saw Melvin inflict on defendant were serious. Kadijah did not, however, think that defendant was in danger of losing his life or limbs. Further in her testimony, Kadijah stated that she was not afraid that defendant or Melvin was going to get hurt during the fight and that she did not really think it was a serious fight.

¶ 36    Corinthian Baker testified that on December 31, 2011, he was at the McKay Street residence, his father's house, visiting for the holidays. Prior to 10 p.m., Corinthian had one drink, to celebrate New Year's Eve. At about 10 p.m., Corinthian was in the living room, when a fight broke out in the kitchen. When Corinthian got to the kitchen, he saw defendant sitting down and Melvin standing over him, asking defendant to "call him another b***." Defendant did so, and Melvin threw three or four punches at defendant's face. Defendant put his arm up and leaned out of the chair to block the punches and to move out of the way and fell out of the chair onto the floor. Melvin picked up the chair and tried to hit defendant with it. Corinthian got between them and tried to break up the fight, but Melvin told him to "get the f*** back" and that it had nothing to do with him.

¶ 37    Corinthian left the kitchen for about five minutes to try to find some help and went to his father's room, but his father was not there. When Corinthian returned to the kitchen, defendant and Melvin were "tussling." Melvin was on the ground, and defendant was on top of Melvin,

straddling him, and was trying to hold Melvin's hands down with his own hands. Corinthian tried to break the fight up again and tried to pull defendant off of Melvin. After that point, Corinthian left the kitchen again, this time for a few seconds, and again tried to find more help. When Corinthian got back to the kitchen, the fight was over. Melvin was holding his face, which had blood on it. Corinthian did not see any blood on defendant.

¶ 38   Corinthian stated further during his trial testimony that at the time he saw defendant on top of Melvin, straddling him, Melvin was not a threat to defendant and defendant was not in danger of losing his life. The only time defendant "could have" been in danger of serious injury was when Melvin was threatening to hit defendant with the chair. When the police came to the residence, Corinthian told the police that he did not know what had started the fight. Corinthian denied during his testimony that he told the police that he did not see who had initiated contact between defendant and Melvin.

¶ 39   Michelle Palaro, called as a rebuttal witness for the State, testified that she was an investigator for the defense. In February 2012, Palaro interviewed Charolyn Holman regarding this case. During that interview, Charolyn told Palaro that she had never entered the kitchen during the incident. Charolyn also told Palaro that while she was sitting in the living room that evening, she had looked away from the kitchen until she had heard something in that direction. Charolyn did not indicate, however, how long she had looked away.

¶ 40   After the evidence had concluded and the attorneys had made their closing statements, the jury was instructed on the law. Among other things, the jury was instructed on self-defense and on the definitions of the terms "brutal," "heinous," and "wanton cruelty." When the jury instructions were completed, the jury began its deliberations. The jury later returned with its verdict, finding defendant guilty of both aggravated domestic battery and aggravated battery, and also finding that the State had proven that when defendant committed the offenses, the offenses were accompanied with exceptionally brutal or heinous behavior indicative of wanton cruelty. A presentence investigation report (PSI) was ordered and the case was continued for sentencing.

¶ 41   The PSI indicated that defendant was 33 years old at the time of sentencing and was a high school graduate. Defendant had a sporadic work history, was divorced, and had two children. Defendant was unemployed at the time of the offense and had been collecting social security income. Defendant was allegedly molested as a child and had a rough time growing up. He had a history of alcohol and drug abuse and had used alcohol, phencyclidine (PCP), and cocaine on the date of the incident. Despite his substance abuse problems and his prior involvement with the justice system, defendant had never completed a formal substance or alcohol abuse treatment program. Defendant also had a history of mental health issues and had been hospitalized for them in the past. Defendant had most recently been diagnosed as "Schizo-Affective" and had been prescribed medication for that condition.

¶ 42   Defendant had a prior criminal history as both a juvenile and as an adult and had previously received sentences of supervision, conditional discharge, probation, intensive probation, county jail, and prison. Most notably, as an adult, defendant was convicted of a Class 1 felony drug offense in 1995 and was initially sentenced to four years of probation. His probation was later revoked in 1996 and he was resentenced to four years in prison concurrent with another offense. Also in 1996, defendant was convicted of unlawful possession or use of a weapon by a felon, a Class 3 felony, and was sentenced to three years in prison concurrent with the prison sentence imposed on his 1995 drug case. In 2000, defendant was charged with aggravated

battery of a peace officer, a Class 3 felony. He was convicted of that offense and was sentenced in 2001 to 30 months of intensive probation, concurrent with another case. Also in 2001, defendant was convicted of another aggravated battery of a police officer, a Class 3 felony, and was sentenced to 30 months of intensive probation, concurrent with the sentence in his 2000 aggravated battery case. In 2005, defendant was charged with domestic battery, a Class A misdemeanor. He was convicted of that offense and was sentenced in 2006 to 18 months of conditional discharge and 60 days in county jail and was ordered to obtain an alcohol evaluation and domestic violence counseling. Also in 2006, defendant was charged with resisting a peace officer, a Class A misdemeanor. He was convicted of that offense and was sentenced in 2007 to 12 months of conditional discharge and 76 days in county jail. In 2010, defendant was charged with aggravated assault of a peace officer, a Class A misdemeanor. He was convicted of that offense and was sentenced in April 2011 to 12 months of conditional discharge and 90 days in county jail.

¶ 43    Prior to the sentencing hearing, defendant filed a motion for new trial. In the motion, defendant alleged, among other things, that he was not proven guilty beyond a reasonable doubt of either offense. Defendant's motion was subsequently denied.

¶ 44    At the sentencing hearing, the State presented the testimony of three witnesses. Will County Sheriff's Deputy Daniel Jungles testified that in November 2005, he and another officer were dispatched to the McKay Street residence. Upon arrival, the officers were told by Nannetta and Mikah Johnson that defendant was drunk and belligerent and was tearing up the house.[2] The officers went into the house to try to speak to defendant, who was seated in the kitchen. When defendant saw the officers, he stood up and said "who called the mother f*** cops." Defendant then grabbed Mikah Johnson by the throat and started choking him, right in front of the officers. Jungles and the other officer had to restrain defendant and had to physically pry defendant's fingers off of Mikah Johnson's throat.

¶ 45    Will County Sheriff's Deputy Andrew Schwartz testified for the State at the sentencing hearing that in April 2011, he was on patrol in the area of Arthur and Woodruff in Joliet when he made a traffic stop on a tan Buick for not having a registration light. As Schwartz started to get out of his vehicle, defendant, who was standing in a driveway right next to where the offending vehicle had pulled over, approached the vehicle. Schwartz called for backup and ordered defendant to back away from the vehicle for safety concerns because he did not know what defendant was doing there. Defendant told Schwartz that he "could go f*** [himself]," that he was next to defendant's driveway, and that defendant would do what he wanted to do. Schwartz again ordered defendant away from the vehicle. Defendant stepped back a little bit and then began to approach the vehicle again. Schwartz ordered defendant away from the vehicle one or two more times. Defendant began approaching Schwartz or his vehicle in an aggressive manner and then stepped away. Defendant again told Schwartz that he "could go f*** [himself]," and that defendant would do what he wanted to do. Defendant began to circle around the front of the vehicle that Schwartz had stopped. Defendant also began reaching in his pockets and stated that "shots were going to fly" and that he was "going to f*** [Schwartz] up." Schwartz felt threatened at that point and believed that defendant had a gun in his pocket or in his pants. Schwartz drew his service weapon toward defendant and ordered defendant to

_____

[2]It is unclear from the record before us whether Mikah Johnson was Nannetta's husband, Michael Johnson, or someone else.

take his hands out of his pockets and to put them into the air. Defendant did not comply. Defendant refused to comply with Schwartz's order two or three more times before a backup officer arrived. After a physical struggle during which defendant was taken to the ground, Schwartz and the other officer were eventually able to handcuff defendant. During the struggle, defendant refused to comply with Schwartz's commands and kept putting his hands underneath his body. Schwartz did not know what defendant was reaching for and assumed that defendant had a weapon. Defendant tried to spit on the officers once or twice. When the officers would try to stand defendant up to take him to the squad car, defendant would make his body go limp. Defendant stated that his head hurt from being taken to the ground, so an ambulance was called.

¶ 46       Defendant's demeanor was the same at the hospital. Defendant threatened the officers and the hospital staff and stated that he was "going to f*** everybody up." When the officers tried to transport defendant from the hospital to the county jail, defendant again made his body go limp and the officers had to pick defendant up and put him in the police vehicle. Schwartz's reason for stopping the vehicle that night had nothing to do with defendant, and the occupants of the vehicle stated that they had no idea who defendant was. Schwartz noticed during the encounter that defendant was aggressive and that there was a smell of alcohol coming off of defendant's breath.

¶ 47       Will County Sheriff's Deputy Brian Monahan testified for the State at the sentencing hearing that in February 2009, he was dispatched to the McKay Street residence regarding a hang-up to a 9-1-1 call. Upon arrival at the residence, Monahan spoke to Sherylyn Holman, the person who had dialed 9-1-1.[3] Sherylyn told Monahan that she was in a domestic altercation with defendant, who was her brother, over a set of car keys and over defendant's ability to drive Sherylyn's minivan. Monahan went inside the residence to determine the location of the car keys and to verify that everyone was safe. Monahan was told that defendant was upstairs in his bedroom with a 15-year-old family member. Monahan and another officer knocked on defendant's bedroom door, and a voice behind the door stated, "get the f*** away from the door." Upon Monahan's request, the person behind the door identified himself as defendant. The person behind the door told Monahan that if Monahan touched the door, he was going to shoot him through it. Monahan asked the person behind the door if he would shoot a police officer and the person began screaming, "shots fired, shots fired," and "shots going to be fired," and began making siren noises. The officers moved back to a safe location and called for a tactical unit and a trained hostage negotiator to come in. Using a bullet-proof shield for protection, the hostage negotiator spoke through the door to the person behind it. After an unknown amount of time, defendant came out of the bedroom with a 15-year-old boy.

¶ 48       Defendant's mother, Nannetta Johnson, was called by the defense at the sentencing hearing to testify on defendant's behalf. Johnson testified that defendant completed high school and that defendant was responsible for, and took care of, his own mental health issues. According to Johnson, defendant was very responsible in that regard. Johnson testified further that her brother, Clifford Melvin, moved in with her several years ago after he had been put out of his residence. Melvin was only supposed to live with Johnson for a few months, but it ended up being for 10 years. When asked if defendant and Melvin got along, Johnson stated that Melvin

_____

[3]It is unclear from the record before us whether Sherylyn Holman was defendant's sister, Charolyn, or another sister of defendant.

was not the type of person you got along with; that Melvin just kept to himself and did not talk much; and that when Melvin did say something, it was always with a growl or a snarl. Johnson had seen defendant try to be nice to Melvin in the past, but Melvin was cold-hearted and would always tell defendant to get away from him. In response to a question from the defense, Johnson stated that she wanted the court to know that defendant was not a criminal or an angel, that defendant had his faults, that defendant was not stupid, that defendant had a spiritual side, and that defendant had an alcohol problem. According to Johnson, defendant had a prior run-in with police officers in which he was beaten and eventually won a settlement from that incident. Ever since that time, defendant had been afraid of police officers.

¶ 49        As part of the sentencing hearing, the trial court heard Melvin's victim impact statement. In the statement, Melvin told the court about the devastating effect the injury he sustained had on his ability to function in life without assistance and on his ability to enjoy life in general. Melvin stated further that defendant was a danger to everyone around him, especially his family.

¶ 50        After the attorneys made their sentencing recommendations, the trial court heard defendant's statement in allocution. Defendant told the trial court that he was sorry that "this" ever happened and that it would not have happened if he had been taking his medications and not using drugs and alcohol. Defendant stated further that a pattern had developed that when he was off his medications and using drugs and alcohol, he would end up doing and saying a lot of ignorant things that he was not proud of and would wind up in jail. According to defendant, his mind had not been right ever since he had been the victim of police brutality. Defendant asked for help in overcoming the obstacles in his life, told the court that he was just a person who had made a lot of mistakes, and asked the trial court to have mercy on him.

¶ 51        When defendant had finished his statement in allocution, the trial court announced its sentencing decision. The following was stated:

> "THE COURT: *** The law requires me to take into consideration the factors in aggravation and mitigation, whether a sentence that I impose is necessary to deter other similar offenses, whether it is brutal and heinous indicative of want of [*sic*] cruelty, if you have any prior record, a little bit about your family. I see you have two children. About your prior record, you have been in the system for quite a while, Mr. Holman, starting with juvenile cases, a criminal trespass, aggravated batteries, stolen vehicle, and then I'm not sure if this is delivery or possession with intent Class 1 felony in '95. A UUW in '96, aggravated battery to a police officer, in 2000. Aggravated battery to a police officer 2001 and a series of misdemeanors that I do note that some of them are domestic batteries or aggravated batteries or batteries. In other words, aggressive behavior on your behalf.
>
> The jury made a specific finding that this was brutal and heinous conduct on your part. The jury totally disregarded any self-defense evidence that was presented to them. I mean, what you did here is you went way over – even if what you say is true and with the testimony where the defense was that Mr. Clifford Melvin was the aggressor, what the jury disregarded was that the fact that even if he was the aggressor, your response to that aggression was according to Mr. Clifford Melvin sitting on him, your knees on his shoulders and pushing his eye sockets into his eyes until they came – kind of came out of his face. So the jury looked at all of that and rejected it. You are now 33?
>
> THE DEFENDANT: Yes, ma'am.

THE COURT: You have had these drug and alcohol and mental health issues for quite a while.

THE DEFENDANT: Yes, ma'am.

THE COURT: All right. I mean, you are a grown man. So I don't know. I guess my thought is that you are a grown man and you should be able to take care of these yourself as opposed to having your mother do it for you or anybody else. I appreciate the fact that you took the opportunity while you have been incarcerated to address some of these issues and have medication and take classes to prevent future criminal behavior but at the same time I have to take a look at what you did and your criminal history.

\* \* \*

THE COURT: \*\*\* Mr. Holman, I have been doing this for almost 19 years and I very rarely sentence somebody to the maximum. I will sentence you to the maximum for 14 years based upon the nature of the crime, the permanent effects of what happened that day to Mr. Melvin and he will never be able to overcome and that is at 85 percent."

¶ 52    Defendant filed a motion to reconsider his sentence, alleging that his sentence was excessive in light of his plea for help with his chemical dependencies and mental health issues and that he was more likely to be rehabilitated through a shorter prison sentence combined with mental health and substance abuse treatment. The trial court denied the motion, stating that in making its decision, it had taken into consideration all of the factors in aggravation and mitigation, a letter defendant had written to the court, and defendant's statement in allocution. This appeal followed.

¶ 53                                ANALYSIS

¶ 54    As his first point of contention on appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of aggravated domestic battery. Defendant asserts that the State failed to prove that he was not justifiably acting in self-defense when he pressed his thumbs into Melvin's eye sockets. In support of that assertion, defendant claims that the testimony of all three eyewitnesses (Charolyn, Kadijah, and Corinthian) contradicted Melvin's testimony and established that: (1) Melvin was the initial aggressor and repeatedly punched defendant; (2) defendant's actions were not premeditated but, rather, took place in the middle of a heated, rapidly escalating physical altercation; and (3) defendant's belief as to the need for self-defense was reasonable under the circumstances and based upon defendant's knowledge that Melvin had been trained in the military to fight with his hands and feet and had fought in two wars. Defendant asserts, therefore, that all of the elements of self-defense were satisfied and that his conviction of aggravated domestic battery should be reversed.

¶ 55    The State argues that defendant's conviction was proper and should be upheld. The State asserts that when the trial evidence is viewed in the light most favorable to the State, the State easily proved beyond a reasonable doubt that defendant did not justifiably act in self-defense when he injured Melvin. In support of that assertion, the State contends that: (1) defendant could not have reasonably thought, when he was on top of the smaller and older Melvin, that it was necessary to attempt to gouge out Melvin's eyes in order to protect himself from Melvin; (2) defendant chose to maim or blind Melvin rather than to reasonably resist him; (3)

defendant's comment, "there's only one king," shows that defendant was acting as an attacker during the incident and was not acting in self-defense; (4) defendant's self-defense claim was further refuted by Melvin's account of what had occurred and by the evidence that defendant was belligerent at the scene to the police officers, that defendant was larger in size than Melvin, and that Melvin was still suffering from the permanent effects of a prior injury that resulted in loss of strength to his right side; (5) the jury could have found that all three eyewitnesses were not credible because the witnesses did not speak significantly to the police officers at the scene and because some of the trial testimony of the witnesses was inconsistent with prior statements they had made or was contradicted by the testimony of Melvin; (6) even if the testimony of the three eyewitnesses was credible, it did not support a claim of self-defense as all three eyewitnesses testified that defendant was on top of Melvin, straddling him, before gouging out Melvin's eyes and that Melvin was not a significant threat to defendant; (7) the fact that Melvin had judo training in the Army in 1967 did not support defendant's claim of self-defense, since Melvin had suffered a subsequent injury that resulted in a loss of strength on his right side; and (8) self-defense does not justify an act of retaliation or revenge, such as the one in the present case. The State asks, therefore, that we affirm defendant's conviction.

¶ 56    Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). Under that standard, "a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review gives " 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Jackson*, 232 Ill. 2d at 281 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial, or whether defendant received a bench or a jury trial, and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction. *Jackson*, 232 Ill. 2d at 281; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard, a reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 57    Section 7-1 of the Criminal Code of 1961 provides, in pertinent part, that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself [(self-defense)] or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2010). Self-defense is an affirmative defense–once it has been raised by the defendant, the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. 720 ILCS 5/7-14 (West 2010); *People v. Lee*, 213 Ill. 2d 218, 224 (2004). To establish a claim of self-defense, the defendant must present some evidence as to each of the following six elements: (1) that unlawful force was threatened

- 14 -

against him; (2) that he was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that he actually and subjectively believed a danger existed that required the use of the amount of force applied; and (6) that his beliefs in that regard were objectively reasonable. See 720 ILCS 5/7-1 (West 2010); *Lee*, 213 Ill. 2d at 225; *People v. Montes*, 263 Ill. App. 3d 680, 690 (1994). If the State negates any of those elements, the defendant's claim of self-defense must be rejected. *Lee*, 213 Ill. 2d at 225.

¶ 58    A person acting in self-defense "is justified in the use of force which is intended or likely to cause death or great bodily harm [(deadly force)] only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2010). The determination of whether deadly force is legally justifiable is dependent upon the circumstances involved. See *People v. Woods*, 81 Ill. 2d 537, 542 (1980). The decisive question is whether the defendant's belief that it was necessary to use deadly force was reasonable under the circumstances. See *Montes*, 263 Ill. App. 3d at 690. A person who is thrust into a life-endangering situation is not required to use infallible judgment in deciding whether or how to act to defend himself. See *People v. White*, 87 Ill. App. 3d 321, 323 (1980). Such a requirement would be unreasonable to impose upon a decision that must be made very quickly by a person who is fearful and under great stress. *Id*. The right of self-defense, however, may not be used to justify an act of retaliation or revenge. *Woods*, 81 Ill. 2d at 543. "The self-defense concept is to protect person, not pride." *Id*. If the defendant responds to a confrontation with such excessive force that he is no longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually started the confrontation. *People v. Belpedio*, 212 Ill. App. 3d 155, 161 (1991).

¶ 59    In the instant case, after having considered the evidence presented at trial in the light most favorable to the State (see *Austin M.*, 2012 IL 111194, ¶ 107; *Collins*, 106 Ill. 2d at 261), we conclude that defendant's use of deadly force was not objectively reasonable under the circumstances involved. See 720 ILCS 5/7-1 (West 2010); *Lee*, 213 Ill. 2d at 224; *Montes*, 263 Ill. App. 3d at 690; *Belpedio*, 212 Ill. App. 3d at 161. Even if we took as true the testimony of all three eyewitnesses, as defendant would have us do, defendant's use of force was so excessive, at a time when defendant had the much smaller and much older Melvin down on the ground, that it can only be considered an act of revenge, rather than a legally justifiable use of force in self-defense. See *Woods*, 81 Ill. 2d at 543; *Belpedio*, 212 Ill. App. 3d at 161. At the time that the act was committed, none of the three eyewitnesses felt that defendant was in danger of serious injury to life or limb. Although defendant was not required to have perfect judgment when he was thrust into that situation, his decision as to how to respond to Melvin's aggression went well beyond the bounds of reasonable judgment, regardless of whether Melvin was the initial aggressor. See *id*. Therefore, we find defendant's argument on this issue to be without merit. In reaching that conclusion, we note that the jury was not obligated to accept the three eyewitnesses' version of events over that of Melvin (see *People v. Washington*, 2012 IL 110283, ¶ 36 (it is the function of the jury to determine whether the subjective belief in the need to use force in self-defense existed and whether it was objectively reasonable or unreasonable)), as we did for the sake of argument here, and that Melvin's version certainly refuted any possible claim of self-defense.

¶ 60    As his second point of contention on appeal, defendant argues that the State failed to prove beyond a reasonable doubt that the aggravated domestic battery in this case was accompanied

by exceptionally brutal or heinous behavior indicative of wanton cruelty as was required to make defendant eligible for an extended-term sentence. Defendant asserts that while his conduct was repugnant or reprehensible and possibly even brutal and heinous, it did not rise to the level of being so exceptionally brutal or heinous that it was indicative of wanton cruelty because: (1) there was no evidence that defendant's conduct was premeditated; (2) there was no evidence presented as to the amount of force that was necessary to cause Melvin's eye injuries or the length of time that amount of force would have to be applied; (3) Melvin's injury occurred during the course of a physical altercation; and (4) there was no evidence of torture, sadism, threats, or gratuitous violence. In making that assertion, defendant claims that the severity of Melvin's injuries cannot be used to form the basis of a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty because the infliction of great bodily harm was an inherent element of the aggravated domestic battery charge of which defendant was convicted. Defendant asks, therefore, that we vacate his extended-term sentence and that we remand this case for defendant to be resentenced within the nonextended Class 2 felony sentencing range.

¶ 61    The State argues that it proved beyond a reasonable doubt that the offense in this case was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty. The State asserts that when the evidence in this case is viewed in the light most favorable to the State, it shows that the younger, larger defendant straddled Melvin, who was on the ground on his back, pinned Melvin's arms down, pressed his thumbs into Melvin's eye sockets with all his weight, exclaimed triumphantly that "there's only one king," and prevented Melvin from using the phone upstairs to call for aid after the eye injury had been inflicted. The State asserts further that those facts speak for themselves on this issue and claims that expert medical testimony was not required to establish that defendant's conduct was likely to cause significant or catastrophic injury to Melvin's eyes. For those reasons, the State asks that we reject defendant's argument on this issue and that we allow defendant's extended-term sentence to stand.

¶ 62    The maximum prison sentence for aggravated domestic battery, a Class 2 felony, is normally seven years. 730 ILCS 5/5-4.5-35(a) (West 2010). However, if the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (the finding of exceptionally brutal or heinous behavior), the trial court may impose an extended-term sentence of up to 14 years in prison. 730 ILCS 5/5-5-3.2(b)(2) (West 2010). Other than the fact of a prior conviction, any factual finding that increases a defendant's sentence beyond the statutory nonextended-term maximum, such as the finding of exceptionally brutal or heinous behavior, must be proven to a jury beyond a reasonable doubt. See *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *People v. Swift*, 202 Ill. 2d 378, 392 (2002); *People v. Smith*, 362 Ill. App. 3d 1062, 1087 (2005). In addition, similar to the previous issue raised in this appeal, when the sufficiency of the evidence for a finding of exceptionally brutal or heinous behavior is challenged on appeal, the reviewing court must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have concluded that the finding was proven beyond a reasonable doubt. *Austin M.*, 2012 IL 111194, ¶ 107; *Collins*, 106 Ill. 2d at 261; *People v. Callahan*, 334 Ill. App. 3d 636, 649 (2002) (the appellate court treated the finding of exceptionally brutal or heinous behavior as an element of the offense that had to be alleged in the charging instrument and proven to the jury beyond a reasonable doubt).

¶ 63    To qualify for a finding of exceptionally brutal or heinous behavior, the defendant's conduct must be both: (1) exceptionally brutal or heinous; and (2) indicative of wanton cruelty. See *People v. Nielson*, 187 Ill. 2d 271, 298-99 (1999); *People v. Nitz*, 219 Ill. 2d 400, 418 (2006). When applicable, all three terms, "brutal," "heinous," and "wanton cruelty" are to be defined according to their ordinary and popular meaning. *Nitz*, 219 Ill. 2d at 418. The term "brutal" is defined as cruel and cold-blooded, grossly ruthless, or devoid of mercy or compassion; the term "heinous" is defined as enormously and flagrantly criminal, hatefully or shockingly evil, or grossly bad; and the term "wanton cruelty" is defined as consciously seeking to inflict pain and suffering on the victim of the offense. Illinois Pattern Jury Instructions, Criminal, No. 28.03 (4th ed. Supp. 2011); *Nielson*, 187 Ill. 2d at 298-99; *Nitz*, 219 Ill. 2d at 418. "A single act that causes death or injury may be sufficient to demonstrate the existence of wanton cruelty [citation]; however, the extended-term provision was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence [citation]." *People v. Pugh*, 325 Ill. App. 3d 336, 346 (2001). When assessing the brutality and heinousness of a crime, the trier of fact must consider all of the facts surrounding the incident in question, and each case must be decided on its own facts. *Smith*, 362 Ill. App. 3d at 1087-89; *Pugh*, 325 Ill. App. 3d at 346. Some of the factors that the courts have considered in determining whether behavior is exceptionally brutal or heinous and indicative of wanton cruelty include whether the offense was premeditated, whether the defendant was provoked to act, the senseless nature of the act, the number of wounds inflicted, the danger created by the act, the extent of the injury inflicted, whether the defendant exhibited remorse, whether the defendant inflicted prolonged pain or torture, whether defendant shot the victim at close range, and whether defendant inflicted mental suffering on the victim. *Id*. In addition, although cases in which exceptionally brutal or heinous behavior has been found to be present have generally involved prolonged pain, torture, or premeditation, the presence of such conduct is not required for a finding of exceptionally brutal or heinous behavior to be made. *Nitz*, 219 Ill. 2d at 418; *Smith*, 362 Ill. App. 3d at 1090.

¶ 64    In the present case, the evidence, viewed in the light most favorable to the State, showed that during an altercation, while defendant had Melvin pinned down and under control, defendant took his thumbs and pressed them with all of his weight into Melvin's eye sockets and told Melvin that "there's only one king." Defendant's conduct, a senseless act of gratuitous violence, caused severe injury to Melvin and resulted in Melvin losing one eye and having only limited vision in the other. At the time the injury was inflicted, defendant, who was substantially younger and larger than Melvin, had Melvin under control and was not in any serious danger of being harmed by Melvin. Just after the incident, defendant showed no remorse or concern for what he had done, did not call for an ambulance for Melvin, and prevented Melvin from doing so.[4] Based upon all of the evidence presented, we conclude that a rational trier of fact could have found that the aggravated domestic battery in the instant case was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. See *Austin M.*, 2012 IL 111194, ¶ 107; *Collins*, 106 Ill. 2d at 261; *Callahan*, 334 Ill. App. 3d at

---

[4]It is unclear under the law how defendant's alleged expression of remorse at sentencing would factor into the determination of whether defendant's conduct was exceptionally brutal or heinous. The jury in this case would not have heard defendant's later expression of remorse at sentencing, and it would have been for the trial court to determine whether that expression was truly sincere.

649. Although there was no torture or premeditation in the present case and this incident arguably did not involve prolonged pain, that type of conduct, as noted above, was not required for a finding of exceptionally brutal or heinous behavior to be made. See *Nitz*, 219 Ill. 2d at 418; *Smith*, 362 Ill. App. 3d at 1090. Moreover, while we recognize that the infliction of great bodily harm or permanent disability was inherent in the charge against defendant, "[s]ome behavior is so much more brutal or heinous and so clearly indicative of wanton cruelty that it qualifies a defendant for extended term even if it is the predicate act of the offense." *People v. Yarbrough*, 156 Ill. App. 3d 643, 648 (1987) (the defendant's actions of dragging the 82-year-old victim around by the hair while she had a broken hip that he had caused and refusing to permit the other victim to rinse his face after the defendant had thrown a caustic substance into that victim's face and eyes were not inherent in the home invasion and heinous battery charges against the defendant and were sufficient to make the defendant eligible for extended-term sentences on those charges). We, therefore, uphold the jury's finding that the aggravated domestic battery in this case was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. See *Austin M.*, 2012 IL 111194, ¶ 107; *Collins*, 106 Ill. 2d at 261; *Callahan*, 334 Ill. App. 3d at 649.

¶ 65    As his third point of contention on appeal, defendant argues that the trial court committed an abuse of discretion in sentencing him by focusing on an improper factor in aggravation–that defendant's conduct resulted in great bodily harm or permanent disability to Melvin, a factor that was inherent in the aggravated domestic battery charge and could not be used to further enhance the sentence imposed. [5] Defendant claims that the trial court's comments at sentencing show that it imposed a harsher sentence on defendant based upon its consideration of that improper factor. Defendant asks, therefore, that we either reduce his sentence on appeal to seven years in prison, the maximum nonextended-term sentence for the offense (730 ILCS 5/5-4.5-35(a) (West 2010)), or that we vacate defendant's improper sentence and remand for resentencing.

¶ 66    The State argues that the trial court did not consider an improper factor in sentencing defendant. The State asserts that the trial court's comments merely indicated that it considered the nature and circumstances of the instant offense–most notably, that the great bodily harm or permanent disability that the defendant caused Melvin in the instant case was exceptionally or extremely great in nature and was much more than was required under the statute to obtain a conviction. The State asks, therefore, that we affirm defendant's sentence and that we deny defendant's request to reduce the sentence on appeal or to remand for resentencing.

¶ 67    A trial court's sentencing decisions are entitled to great deference and weight and will not be altered on appeal absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 18-19 (1991); *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). One of the ways that an abuse of discretion may occur in sentencing is if the trial court improperly relied in aggravation on a factor that was inherent in the underlying offense. See *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981). In determining whether the trial court based its sentencing decision on proper

---

[5]Recognizing that this issue has potentially been forfeited on appeal because it was not properly preserved in the trial court, defendant argues in his appellate brief that we should reach the merits of this issue, regardless of any forfeiture, as a matter of plain error or because the failure to preserve the issue was the result of ineffective assistance of trial counsel. However, since the State has not asserted forfeiture here, we need not address that aspect of this issue and will proceed directly to the merits.

aggravating and mitigating factors, a court of review must consider the record as a whole and must not merely focus upon a few words or statements that were made by the trial court. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). A strong presumption exists that the trial court's sentencing decision was based upon proper legal reasoning. *Id*. at 942-43. It is defendant's burden to affirmatively establish that the sentence imposed was based upon improper considerations. *Id*. at 943.

¶ 68    In general, a factor implicit in the offense of which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). In other words, a single factor cannot be used as both an element of the offense and as a basis for imposing a harsher sentence than might otherwise have been imposed upon the defendant because to do so would constitute an impermissible double enhancement. *Id*. at 11-12. The rule against double enhancement is based upon the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in that offense. *Id*. at 12.

¶ 69    In *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986), our supreme court addressed the specific aspect of double enhancement that is present in the instant case, stating:

"Although *Conover* stands for the proposition on which the defendant relies, this court did not intend a rigid application of the rule, thereby restricting the function of a sentencing judge by forcing him to ignore factors relevant to the imposition of sentence. The Illinois Constitution provides that '[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.' [Citation.] A reasoned judgment as to the proper penalty to be imposed must therefore be based upon the particular circumstances of each individual case. [Citations.] Such a judgment depends upon many relevant factors, including the defendant's demeanor, habits, age, mentality, credibility, general moral character, and social environment [citations], as well as the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant. [Citations.]

Sound public policy demands that a defendant's sentence be varied in accordance with the particular circumstances of the criminal offense committed. Certain criminal conduct may warrant a harsher penalty than other conduct, even though both are technically punishable under the same statute. Likewise, the commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm. The legislature clearly and unequivocally intended that this varying quantum of harm may constitute an aggravating factor. While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*. [Citations.]" (Emphases in original and omitted.) (Internal quotation marks omitted.) *Saldivar*, 113 Ill. 2d at 268-69.

Despite those statements of the law in this area, the supreme court in *Saldivar* nevertheless went on to find that the trial court had considered an improper factor in aggravation when sentencing the defendant, stating:

"[T]he record demonstrates that the circuit court focused primarily on the end result of the defendant's conduct, *i.e.*, the death of the victim, a factor which is implicit in the offense of voluntary manslaughter and which, under this court's reasoning in [*Conover*], cannot be considered in aggravation." *Saldivar*, 113 Ill. 2d at 272.

¶ 70 Focusing on different aspects of the *Saldivar* decision, each side in this appeal argues that the ruling in *Saldivar* favors that particular side's position. However, when we consider the sentencing hearing as a whole and the entire comments of the trial court in context, we find that the trial court did not rely on a factor inherent in the offense in sentencing defendant to the maximum extended term. Unlike the voluntary manslaughter in *Saldivar*, which had only one end result–the death of the victim–the aggravated domestic battery in the present case encompassed a wide range of possible end results, all falling under the category of great bodily harm or permanent disability. In determining the sentence that was warranted in this case, the trial court was required to consider the extent of great bodily harm or permanent disability inflicted on Melvin and the manner in which it was inflicted. As the evidence clearly showed, the extent of the great bodily harm or permanent disability inflicted in the instant case went far beyond what was necessary under the statute to obtain a conviction for aggravated domestic battery. Thus, under the circumstances of the present case, we find that the trial court did not consider an improper factor in sentencing defendant, even though the trial court made a specific comment about the permanent nature of Melvin's injuries. See *People v. Rader*, 272 Ill. App. 3d 796, 808 (1995) (in a case in which the defendant was convicted of aggravated battery of a child, the appellate court rejected the defendant's claim that the trial court had improperly considered the degree of harm to the victim, a factor inherent in the offense, as a factor in aggravation at sentencing and noted that despite the inherent factor, the trial court was still free to consider at sentencing the nature and circumstances of the offense, including the nature and extent of each element of the offense as committed by the defendant).

¶ 71 As his final point of contention on appeal, defendant argues that the trial court committed an abuse of discretion in sentencing defendant to 14 years in prison, the maximum extended-term sentence available for the offense in the instant case. Defendant asserts that the maximum extended-term sentence was excessive in light of the circumstances of this case in which the offense occurred as part of a physical altercation between Melvin and defendant and in light of the significant mitigation that was presented in favor of defendant, most notably, defendant's belief that he needed to defend himself from Melvin; defendant's substance abuse problems; defendant's mental health issues; defendant's history of being sexually abused as a child; defendant's criminal history, which consisted mostly of nonviolent offenses; defendant's expression of remorse; and defendant's strong rehabilitation potential and willingness to seek treatment for his addiction and mental health issues. Defendant asks, therefore, that we reduce his sentence on appeal or remand the matter for resentencing.

¶ 72 The State argues that the trial court's sentencing decision was proper and should be affirmed. The State asserts that the maximum extended-term sentence was warranted based upon defendant's history of violent behavior, defendant's extensive criminal record, the devastating effect of Melvin's injuries; and defendant's lack of sincere remorse or personal responsibility for the offense.

¶ 73 As noted above, a trial court's sentencing decisions will not be altered on appeal absent an abuse of discretion. *Streit*, 142 Ill. 2d at 19; *Alexander*, 239 Ill. 2d at 212-13. The trial court's sentencing decisions are given great deference and weight on appeal because the trial court is

in a far better position than the reviewing court to fashion an appropriate sentence based upon the trial court's firsthand consideration of such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age; whereas the reviewing court has to rely entirely on the record. *Id*. A sentence will be deemed an abuse of discretion if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000) (citing *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). In determining the appropriate sentence, the trial court is not obligated to recite and assign value to each fact presented at the sentencing hearing. *People v. Meeks*, 81 Ill. 2d 524, 534 (1980). It is presumed that the trial court considered any mitigating evidence, absent some indication in the record to the contrary. *People v. Franks*, 292 Ill. App. 3d 776, 779 (1997). Although a sentencing judge must consider a defendant's rehabilitative potential, he need not give it greater weight than the seriousness of the offense. *People v. Jones*, 297 Ill. App. 3d 688, 693 (1998). Rehabilitation, therefore, will not necessarily outweigh other persuasive factors that warrant a severe sentence. *Id*.

¶ 74 Nonetheless, the discretion of a trial court in making sentencing decisions is not totally unbridled, and a reviewing court is empowered under Illinois Supreme Court Rule 615(b)(4) to reduce a sentence. *Streit*, 142 Ill. 2d at 19; *Alexander*, 239 Ill. 2d at 212. However, when a reviewing court examines the propriety of a sentence imposed by the trial court, it should proceed with great caution and care and should not substitute its judgment for that of the sentencing court merely because it would have weighed the factors differently. *Id*.

¶ 75 In the instant case, all of the mitigating factors were present before the trial court at the time of sentencing and there is no indication in the record that the trial court ignored those factors. Contrary to defendant's assertion on appeal, the trial court was not required to view defendant's history of mental health issues and substance abuse problems or defendant's troubled childhood as mitigating in nature. See *People v. Ballard*, 206 Ill. 2d 151, 189-90 (2002) (analysis of aggravating and mitigating factors in context of whether death penalty should have been imposed). The trial court was also not obligated to give great weight to defendant's counseling efforts and good behavior while in jail. See *id*. at 189. As the trial court pointed out in announcing its sentencing decision, defendant had an extensive criminal history as both a juvenile and as an adult and had developed a troubling pattern of violent behavior. In addition, defendant had been given numerous previous chances at rehabilitation with his prior sentences of probation, intensive probation, county jail time, and imprisonment. Defendant had also been struggling with his substance abuse problems and mental health issues for several years, as the trial court noted, and still had not been able to get his problems under control. When we consider those factors with the extent of great bodily harm or permanent disability or disfigurement that was inflicted in the instant case and the lack of other mitigating factors, we find that the trial court did not commit an abuse of discretion in sentencing defendant to the maximum extended-term sentence available. See *Streit*, 142 Ill. 2d at 18-21; *Alexander*, 239 Ill. 2d at 212.

¶ 76                                    CONCLUSION

¶ 77 For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 78 Affirmed.