2022 IL App (2d) 200329-U
No. 2-20-0329
Order filed August 8, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-0711 |
| | ) ) | Honorable |
| ANTHONY L. McFERN, | ) ) | Rosemary Collins Robert Randall Wilt |
| Defendant-Appellant. | ) | Judges, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant received ineffective assistance of counsel when his trial counsel neglected to request a self-defense jury instruction.

¶ 2    Following a jury trial, defendant, Anthony L. McFern, was convicted of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)) (count I), resisting a police officer (720 ILCS 5/31-1(a) (West 2018)) (count II), and violation of bail bond (720 ILCS 5/12-3.2 (West 2018)) (count III), and he was eventually sentenced to a term of six years' imprisonment. Defendant appeals, arguing that: 1) he was denied effective assistance of counsel when his trial counsel failed to request a self-

defense jury instruction; 2) he was denied effective assistance of counsel when trial counsel did not move to sever count III; and 3) he was denied a fair trial when the trial court failed to comply with our supreme court's holding in *People v. Zehr*, 103 Ill. 2d 472 (1984), while questioning prospective jurors. We reverse defendant's domestic battery conviction and remand for a new trial as to that count.

¶ 3                                   I. BACKGROUND

¶ 4       We summarize the relevant facts from the record on appeal. On March 28, 2018, defendant was indicted with counts I, II, and III. According to the indictment, defendant "knowingly made physical contact of an insulting or provoking nature with Porsche Hanley, a family or household member, in that defendant jumped on her and held her down." The indictment additionally specified that, previously, on March 17, 2018, defendant had been "admitted to bail" in case No. 18-CF-527 and had violated his bail bond by coming in contact with Hanley, who also was the victim from that earlier case.

¶ 5       Defendant was appointed an assistant public defender. On May 17, 2018, defendant sought permission to file a motion for affirmative defense *instanter* and requested to receive "any *Gosset*[*t*] *Lynch* material" pursuant to *People v. Gossett*, 115 Ill. App. 3d 655 (1983) and *People v. Lynch*, 104 Ill. 2d 194 (1984). Defendant also filed "an affirmative defense of self-defense," which is absent from the record. On July 31, 2018, the State prepared the *Gossett Lynch* materials for defendant. On August 14, 2018, defendant filed his motion for discovery before trial.

¶ 6       On September 11, 2018, attorney Jeff Heckinger filed his appearance on behalf of defendant. On November 5, 2018, the case proceeded to trial. During jury selection, the court asked potential jurors whether they understood that "the defendant is presumed to be innocent of the charges against him," that, "before the defendant can be convicted, the State must prove the

defendant guilty beyond a reasonable doubt," that "[t]he defendant is not required to offer any evidence on his own behalf," and that, "if the defendant chooses not to testify, it cannot be held against him." However, the court neglected to ask all the prospective jurors—including one who was eventually selected to serve—whether they accepted or agreed to these principles.

¶ 7    Before opening statements, the State verified to the court that it had tendered supplemental *Gosset Lynch* materials to defendant, which contained several court orders stemming from Hanley's recent conviction in a separate case. While not entirely clear from the record, the parties seem to have stipulated that defendant's violation-of-bail-bond charge resulted from a bond violation in case No. 18-CF-527, which also involved Hanley. The parties also stipulated that Hanley had recently been "sent to the Department of Corrections."

¶ 8    The State informed the court that it had recently told Heckinger of a conversation it had with Hanley, in which Hanley advised them that "the defendant never touched her," and that "she had given the public defender's investigator multiple signed statements that [it] had never received." Heckinger already had copies of these signed statements.

¶ 9    The State called Officers Andrew Kennington, Steven Johnson, and Keehnen Davis to testify, as well as 911 dispatcher Nicole Lashock. Lashock testified that, on March 20, 2018, she received a call from a home on Illinois Avenue in Rockford. Other evidence from the trial provided that defendant's mother—Ethel Key—owned the house. Lashock indicated that she heard people yelling in the background of the phone call—which was played for the jury—but she could not decipher who was yelling at whom. She dispatched medical personnel and police to the scene.

¶ 10    Officers Kennington and Johnson both arrived at Key's home for a "medical assist." Kennington arrived before Johnson and saw paramedics "working on" Key, who was located on a set of stairs. He heard "a commotion" on the main level of the residence, consisting of "yelling"

and "arguing." Kennington followed the noise to Key's living room, where he saw "defendant standing above [Hanley]," who was seated on a couch. Kennington did not see any marks, scratches, or bruises on defendant's face, although, from his testimony, it is unclear whether Kennington had a view of defendant's face when he first entered the room. Defendant was "yelling at [Hanley] aggressively," "[h]unched over kind of in her face a little bit," and Hanley was "yelling back at defendant maybe." Defendant "jumped on top of [Hanley] and was holding her down on the couch."

¶ 11    After identifying himself "as Rockford Police," Kennington ordered defendant to get off Hanley. Defendant ignored him, leading Kennington to run towards defendant, grab him "from the back and [throw] him to the ground." Defendant crossed his hands in front of his body, preventing Kennington from placing him in handcuffs. Kennington struck defendant in the face once during the arrest. Officer Johnson, who had since arrived and heard a "loud commotion coming from the living room area," rushed to assist Kennington. He noticed Hanley, who appeared to be frightened. Johnson also noticed that defendant "had a cut above his left eye," which was still bleeding. After the two officers finally placed defendant in handcuffs, Johnson returned to take a written statement from Hanley. In the statement, Hanley did not portray herself as "the aggressor in the incident," but instead provided that "defendant had grabbed her around the neck," "pushed her down on the couch," and "struck her." After Hanley completed her statement, the two "read the form out loud together" so that Hanley could have an opportunity to "make any changes" to her statement as necessary. She signed and initialed the statement, which included a disclaimer that read, "Before signing, I have read or had read to me this page to make certain that this is my statement and that it is the truth." Officer Johnson did not alter the statement after Hanley signed it.

¶ 12    In the meantime, Sergeant Davis arrived at Key's home in response to "a use-of-force

incident" by Officer Kennington. He also noticed the cut over defendant's eye. Defendant informed him that "a female had cut him or scratched him in the eye," although he did not identify Hanley at that time. Defendant "stated that he was upset with [the female], because he felt that it was her fault that his mother fell down the stairs." Davis had an opportunity to speak with Hanley as well, and he "did not see any injuries" on her person.

¶ 13     The State also called Hanley to testify. Hanley testified that defendant was her boyfriend and that they had been dating for "[a] couple months." On March 20, 2018, Hanley was at Key's house with defendant and some other family members before Key fell down her stairs. Afterwards, Hanley recalled someone calling the police. Once the police and an ambulance arrived at Key's residence, defendant joined Hanley in Key's living room. Hanley testified that defendant was standing in front of her, but that he did not push her onto the couch. Hanley disagreed that defendant yelled at her and further represented that defendant "[n]ever" "put his hands on [her.]" According to Hanley, once the officers arrived and told defendant to give them his hands, he complied with their orders "[t]he first time they asked."

¶ 14     The State presented Hanley with the written statement that she had completed in the early morning of March 20, 2018, which Hanley claimed to not recognize. The State pointed out that, in the written statement, Hanley had earlier provided that she "and defendant had been arguing about cheating" in the morning hours of March 20, 2018, and that, "after his mother fell down the stairs, [defendant] came upstairs and yelled at [Hanley] to get out of the house." The written statement also specified that defendant "grabbed [Hanley] around [her] neck with both hands," "pushed [her] down onto the couch," and "hit [her] in the left ear with a closed fist." Still, Hanley disputed the written statement, testifying that she either could not recall making portions of the statement, that the statement conveyed events that did not happen, or that she never made the

assertions detailed in the written statement.

¶ 15　Hanley testified that, on August 31, 2018, she met with an "investigator for a defense attorney," presumably the public defender who had previously represented defendant, and provided that investigator with a second written statement. In that latter statement, she told the investigator that she "was the aggressor" in an incident that took place on March 7, 2018, in an apparent reference to the events leading to case No. 18-CF-527. Hanley denied telling "that investigator anything about *** defendant being on top of [her] on the couch" on March 20, 2018. In the second written statement, she had stated that defendant's "hands were on the cushions" of the couch and that he had "never attempted to strangle [her]."

¶ 16　On cross-examination, Hanley unequivocally recanted her March 20, 2018, statement to police, testifying, "I just seen [*sic*] the statement this morning, and I would not have signed this if I would have known this [information] was on there." Hanley suggested that "somebody added information" to the statement after she had already signed it. However, Hanley testified that her second written statement from August 2018 was truthful. Heckinger asked her, "Did my client at any time on [March 20, 2018,] place hands on you?" Hanley denied that he had, and similarly denied that defendant ever got on top of her or struck her.

¶ 17　On redirect, the State asked Hanley, "And you're saying that your statement that you gave on [March 20]—or that morning I guess—you lied, or that's not what you told the officer?" Hanley responded, "That's not what I told the officers." The State then asked, "So your testimony is that you signed a blank sheet of paper?" Hanley responded, "Um, I—all I know is I got a pink paper that I did sign, whatever, but none of that stuff is on there." The State showed Hanley the first written statement again and asked, "So you signed a blank statement saying that you read it and reviewed it?" Hanley answered, "Yes, I guess so."

¶ 18    After Hanley was excused, the State announced its intention to introduce and publish portions of a certified court report from an arraignment hearing that defendant participated in on March 20, 2018 (arraignment transcript). Heckinger objected based on relevance, but the court overruled the objection. The State read and published the excerpt from arraignment transcript, which provided:

> "DEFENDANT: No. I need to talk to [the court] because you told me a couple weeks ago, about a week-and-a-half ago, if I wished to bond out but not have contact with [Hanley].
>
> [Hanley] had came [sic] back to my house, sir, and I'm the one that called the police. Yes, I did held [sic] her down cause [sic] she scratched me all up in my face, sir. I'm the one that called the officers.
>
> You told me before I left here and the State said, do not have contact."[1]

¶ 19    The State separately moved to admit a copy of defendant's bail bond from 18-CF-527, a certified copy of a jail order from March 8, 2018, which included a "no-contact provision with Porsche Hanley," and the redacted bill of indictment from case No. 18-CF-527. The court granted the State's motions and admitted the evidence.

¶ 20    The court also admitted Hanley's August 2018 written statement into evidence. Afterwards, the State rested its case, and defendant did not call any witnesses to testify on his behalf. The court denied defendant's motion for a directed verdict and proceeded to discuss jury instructions with the parties. Defendant did not make any requests for any particular jury

---

[1] The March 20, 2018, arraignment does not appear in the report of proceedings. Instead, the only arraignment hearing contained within the report of proceedings is from March 29, 2018, and does not include this quoted language.

instructions.

¶ 21     During defendant's closing arguments, Heckinger suggested that the State had not met its burden in proving defendant's guilt beyond a reasonable doubt and vaguely disputed the testifying officers' credibility. Heckinger reminded the jury that "[t]he real question" was whether the State had proven "beyond a reasonable doubt that a domestic battery took place," and pointed out that Hanley had earlier testified to the contrary. Heckinger also contended that Hanley's written statement to police must be examined in conjunction with her August 2018 statement. Following closing arguments, the jury found defendant guilty of all charges.

¶ 22     On December 13, 2018, Heckinger moved to withdraw, citing an "irreparable breakdown in the attorney/client relationship" between himself and defendant. After a hearing, the court granted Heckinger's motion to withdraw.[2] Defendant presented the State and the court with his unsigned *pro se* "motion for a new trial and for ineffective assistance of counsel." The court appointed the public defender (posttrial counsel) to represent defendant, and informed defendant that he would have an opportunity to discuss his motion with posttrial counsel before presenting it to the court.

¶ 23     On January 16, 2019, defendant filed a *pro se* motion for "Relief from Judgments" [*sic*] pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)). On April 23, 2019, defendant, through posttrial counsel, filed a motion for a new trial, arguing that Heckinger's ineffective assistance deprived defendant of a fair trial. On June 14, 2019, defendant amended the motion for a new trial. In the motion, defendant argued that Heckinger was ineffective

---

[2] Judge Robert Randall Wilt presided over the matter after Judge Rosemary Collins—who had presided over the earlier proceedings and trial—had retired.

for failing to: 1) take "any steps to sever [defendant's] [v]iolation of [b]ail [b]ond charge from [his] [d]omestic [b]attery charge;" 2) "take any steps to limit the admission of evidence that was only relevant to the [v]iolation of [b]ail [b]ond charge" and not to the domestic battery charge; 3) "raise the affirmative defense of self-defense; 4) review Hanley's criminal history, including the State's supplemental answer to defendant's earlier motion for discovery which included Hanley's National Crime Information Center documentation and police reports concerning Hanley; 5) ever discuss guilty pleas or trial strategy with defendant; 6) properly cross-examine the State's witnesses; and 7) object to certain portions of the State's evidence.

¶ 24    On July 24, 2019, the trial court held its hearing on defendant's amended motion for a new trial. At the hearing, the State informed the court that, after speaking with defendant, it amended its bill of indictment, "striking one of *** defendant's prior convictions" to downgrade the domestic battery charge from a Class 2 felony to a Class 3 felony with a sentencing range of 2 to 10 years. The parties requested the court to grant defendant's motion for a new trial, so that defendant could plead guilty to the amended domestic battery charge and the resisting charge. Contingent on defendant's agreement, the State planned to dismiss the violation-of-bail-bond charge, as well as certain other pending charges that defendant faced in several unrelated cases. The court entered an order granting the amended motion for a new trial, vacated defendant's prior convictions from his first trial, and accepted defendant's guilty plea pursuant to the parties' agreement.

¶ 25    On October 3, 2019, the parties appeared for a sentencing hearing. There, the court admonished defendant about an error that it had found in the original charging instrument:

        "THE COURT: All right. So what all this boils down to is this. You were originally

        charged by a bill of indictment with what was listed as a Class Two felony, for which you

faced Class X sentencing, which was six to thirty years. That was a mistake. Your prior record is such that you only had three prior convictions, not four—at least involving charges of domestic battery—which means that you were facing Class Three from the get-go, which means you face[d] two to ten years in prison, not six to thirty years in prison."

As a result of the defective indictment, defendant had pleaded guilty to the amended count I with the misunderstanding that the charge had been reduced to a Class 3 felony, despite the fact that he was never originally eligible for a Class 2 felony.

¶ 26    The court informed defendant that, if he did choose to withdraw his guilty plea as a result of the error, "then the State is free to have the convictions from the jury trial reinstated." The State indicated that in such a scenario, it would indeed ask that "all the charges that were dismissed be reinstated." The court conversely informed defendant that, if he did wish to proceed with the guilty plea, it would need to vacate his original plea, reinstate his convictions, then enter an entirely new plea to the corrected domestic battery charge.

¶ 27    On October 10, 2019, defendant filed his motion to withdraw his guilty plea. On November 20, 2019, the court granted the motion for new trial and reinstated defendant's convictions, as well as any charges that were dismissed pursuant to the now-rescinded agreement.

¶ 28    On January 13, 2020, the court held a hearing on defendant's amended motion for a new trial, which remained pending after defendant withdrew his guilty plea. Defendant testified on his own behalf. According to defendant, Heckinger had only met with him "three to four times" prior to his trial and never discussed any potential evidence or defenses relating to defendant's charges. Once defendant learned that the public defender's office had obtained Hanley's August 2018 statement, defendant agreed that it was his "belief or [his] desire" to use that statement to defend himself at trial. However, Heckinger never mentioned the possibility of asserting "the affirmative

defense of self-defense." Defendant further testified that Heckinger never reviewed or discussed Hanley's prior police records or any police photos with defendant.

¶ 29 On cross-examination, defendant remained adamant that he and Heckinger "never talked about anything" and "never went over any paperwork." Defendant further acknowledged that he had only wished to have Hanley testify on his behalf, and that the State did call her as a witness during the trial. For this reason, defendant agreed with the State that "all the evidence [he] wanted at trial was *** entered." Later in his testimony, however, defendant contradicted himself, stating that "[t]he evidence that [he] wanted to be looked at was not presented in this courtroom."

¶ 30 When pressed on why he did not discuss the prospect of further delving into Hanley's background with Heckinger, defendant responded,

> "[Heckinger] was not talking to me about anything. He told me that he had got the evidence and everything, and it was all ready, that's it, so I *** thought that [Heckinger] was really looking into things, but really he wasn't because he told me that I hit the lady."

The State asked, "And that was the evidence at trial, correct, from the police officers?" Defendant responded, "I never hit no one, sir."

¶ 31 Defendant acknowledged that he "wanted to go to trial because [he] didn't do anything, and [he] figured that [Heckinger] could represent [him]" so he "could go home and get back to [his] mom." Defendant never told Heckinger that he wanted a plea agreement and agreed that he "wanted [his] trial," which he got "pretty quickly." When asked about additional evidence that he wanted presented at trial, defendant answered, "Excuse me. What I'm saying, your Honor, and court, I did not put my hands on this young lady. She finally told the truth, and the man didn't step up and do his job."

¶ 32 On redirect, posttrial counsel referred to the State's prior questions regarding any

"witnesses that [defendant] wanted called," leading defendant to remark that he did not believe he needed more witnesses to support a theory of self-defense after Hanley "had come clean."

¶ 33 After defendant testified, the State moved for a directed finding, which the court denied. In doing so, the court pointed out a problem that it perceived regarding defendant's testimony:

> "The problem [defendant has] got, he's also testified, 'I never touched that lady.' That was something that he volunteered sitting up here, so I don't know that there's other evidence that would support a self-defense where you've got a defendant saying he never touched her as opposed to I—I was defending myself."

Nonetheless, the court indicated that it would give defendant an opportunity "to point out in the transcript if it's available where there's something that would support a self-defense."

¶ 34 The State called Heckinger as a witness. Heckinger testified that, after entering an appearance on behalf of defendant, "with the exception of *** one week in October," he met with defendant at least "every Sunday prior to trial." According to Heckinger, defendant expressed interest in calling Hanley and Keys as potential witnesses. Keys was never called as a witness, however, because defendant wanted her to remain seated behind him during the entirety of the trial, which would not have been possible if Keys had testified.

¶ 35 Heckinger had discussed possible affirmative defenses with defendant, but those discussions "didn't go very far." Heckinger specified:

> "[Defendant] has experience in the criminal law system, and as a result of that he had specific ideas as to what should and shouldn't be presented, how it should be presented, and when it should be presented, and he did not agree with me as to the idea of any affirmative defenses such as self-defense or anything like that."

Heckinger believed that defendant was "convinced" that, if Hanley testified that "there was no

physical contact between the two, that he would be found not guilty."

¶ 36     Heckinger claimed to have "attempted to raise" the possibility of severing defendant's violation-of-bail-bond charge from the remaining charges but did not do so because defendant did not want "to discuss" the issue for fear of additional trials. Heckinger discussed the *Gossett Lynch* materials with defendant and testified that Hanley's "prior record" "was presented in court." The State asked Heckinger, "And you had the *Gosset*[*t*]*, Lynch* material?" Heckinger eventually answered, "What I believed was the *Gosset*[*t*]*, Lynch* material, yes. It satisfied me." Heckinger testified that he had also attempted to discuss jury instructions with defendant, but defendant "essentially brushed them aside."

¶ 37     On cross-examination, Heckinger verified that, after having entered his appearance for defendant, he did not file any pretrial motions or any notices of any affirmative defenses. Posttrial counsel showed Heckinger a CD that had been attached to the State's answer to defendant's motion for discovery, which contained certain Rockford Police Department reports. Heckinger agreed that the reports constituted "*Gosset*[*t*] *Lynch* type material," which he had never personally reviewed.

¶ 38      Turning to Heckinger's earlier testimony that he did not seek to sever the violation-of-bail-bond charge in order to avoid multiple trials, posttrial counsel asked whether—in hindsight – Heckinger thought that he "should have moved to sever" counts II and III from count I. Heckinger eventually answered, "In hindsight, probably would have been better to sever."

¶ 39     Posttrial counsel questioned Heckinger as to certain evidence that the State admitted at trial, such as the arraignment transcript, defendant's bail bond sheet, defendant's March 8, 2018, jail order, and the redacted bill of indictment from Case no. 18-CF-527. Heckinger admitted that he did not seek to have any limiting instructions entered for any of this evidence, despite the fact that the evidence mainly pertained to count III—defendant's violation-of-bail-bond charge.

Heckinger also acknowledged that, during trial, he did not object to the State's introduction of the arraignment transcript, the bail bond sheet, the jail order, or the redacted bill of indictment.[3]

¶ 40    Returning to the topic of jury instructions, Heckinger testified that he "went through" the instructions with the State and then the court, and that he had not objected to any of the State's proposed instructions. He did not seek "an alternative instruction with regard to violation of bail bond," because the proposed instruction already "followed what the charge was."

¶ 41    Heckinger recognized that the arraignment transcript "indicated the potential for a self-defense" instruction. Similarly, Heckinger agreed with posttrial counsel that several portions of the testifying officers' testimonies "suggested *** a self-defense claim."

¶ 42    On redirect, Heckinger explained that he never requested limiting instructions because defendant "believed that [Hanley's] testimony and recantation as to what happened or didn't happen was going to carry the day." Heckinger continued, "[Defendant's] belief was that—that the [domestic battery] charge was the significant one that we had to deal with, forget about the other two misdemeanors." Defendant seemed to just want the whole "thing over with," and did not want Heckinger "to spend time doing anything other than trying the case."

¶ 43    On February 21, 2020, the trial court made several rulings on defendant's amended motion for a new trial. The court first found that Heckinger's failure to seek severance of the violation-of-bail-bond charge did not constitute ineffective assistance of counsel because defendant demonstrated neither deficient performance nor prejudice pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). Next, the court conceded that it "would have been advisable" for Heckinger

---

[3] Heckinger appears to have been mistaken, because, as we have mentioned above, he did object to introduction of the transcript on the basis of relevance.

to seek a limiting instruction "regarding the domestic battery charge," especially considering that the State never filed a motion under section 115-7.4 of the Code of Criminal Procedure (725 ILCS 5/115-7.4 (West 2018)) so that "evidence of prior acts of domestic violence" could have otherwise been admitted. Nonetheless, the court found that defendant did not show prejudice resulting from the lack of a limiting instruction. Accordingly, Heckinger's failure to seek limiting instructions could not support a claim of ineffective assistance of counsel. The court was concerned about the issue regarding a self-defense instruction, and it ordered the parties to conduct further research on the issue. The court rejected defendant's remaining contentions because the alleged errors did not demonstrate counsel's ineffectiveness.

¶ 44    On March 25, 2020, the trial court rejected defendant's remaining arguments concerning the lack of a self-defense instruction, effectively denying defendant's amended motion for a new trial in its entirety. The court first found that the decision to submit a self-defense jury instruction is a matter of trial strategy, "which means it's the attorney's decision, not the defendant's decision." The court also determined that "[a] self-defense instruction may be sought if it's supported by evidence, even if doing so is inconsistent with the defense's theory." Citing various portions of the State's evidence that supported a self-defense theory, the court found that Heckinger's failure to tender a self-defense instruction was objectively unreasonable.

¶ 45    Regardless, the court found that defendant did not establish prejudice resulting from Heckinger's unreasonable performance. According to the trial court, a self-defense theory would have been severely undercut by Officer Kennington's testimony, as he "did not see Porsche Hanley do anything to precipitate [defendant leaping on her]." The court reasoned that, even if Hanley did cause "the injury above [defendant's] eye," by the time defendant leapt on Hanley, he was no longer under an imminent threat of harm. For this reason, the court characterized defendant's

actions as "retaliation" rather than "self-defense."

¶ 46     On June 10, 2020, the parties presented the trial court with an agreed-upon sentence for six years' incarceration as to the domestic battery charge, followed by four years of mandatory supervised release. Pursuant to the agreement, defendant's other pending, unrelated matters before the court would be dismissed. The court sentenced defendant according to the terms of the agreement on all the counts. Defendant timely appeals.

¶ 47                                    II. ANALYSIS

¶ 48     On appeal, defendant argues that he is entitled to a new trial as to his domestic battery conviction because: 1) Heckinger was ineffective for failing to request a self-defense jury instruction; 2) Heckinger was ineffective for failing to move to sever the violation-of-bail-bond charge from defendant's remaining charges; and 3) the trial court failed to comply with *Zehr*, 103 Ill. 2d 472, while questioning prospective jurors. Because we determine counsel provided ineffective assistance by failing to request a self-defense jury instruction, we vacate defendant's conviction for domestic battery and remand for a new trial as to that count.

¶ 49     The United States and Illinois constitutions guarantee criminal defendants the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Pursuant to the U.S. Supreme Court's decision in *Strickland*, 466 U.S. at 687, in order to prevail on a claim of ineffective assistance of counsel, a defendant must show: 1) that their trial counsel "was objectively unreasonable under prevailing professional norms;" and 2) that, but for trial counsel's unreasonable performance, there is a "reasonable probability" that the result of the trial would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687). In establishing deficient performance, a defendant must "overcome the presumption that his attorney's decisions were an exercise of reasonable trial strategy." *People v.*

*Getter*, 2015 IL App (1st) 121307, ¶ 72.

¶ 50    "Whether trial counsel provided ineffective assistance is a mixed question of fact and law." *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). Accordingly, in reviewing a trial court's decision as to whether counsel was ineffective, "we defer to the trial court's findings of fact, but we make an independent judgment about the ultimate legal issue." *Id.*

¶ 51    "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* A criminal defendant is entitled to a self-defense jury instruction where any credible evidence whatsoever supports such a defense, no matter how slight. *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56. This remains true even where the defense is inconsistent with a defendant's own testimony or legal theory, or where the State alone offers evidence in support of the defense. *People v. Everette*, 141 Ill. 2d 147, 156 (1990); *People v. Lyda*, 190 Ill. App. 3d 540, 545 (1989). "Failure to request a self-defense instruction constitutes ineffective assistance of counsel when such a failure was not the result of trial strategy." *People v. Haynes*, 408 Ill. App. 3d 684, 689 (2011). An attorney's decision can fairly be characterized as "strategic" where it was "made after thorough investigation of law and facts." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687).

¶ 52    Here, defendant was denied effective assistance of counsel when Heckinger failed to tender

a self-defense instruction. Numerous portions of the State's evidence supported such a defense, including: 1) Officer Johnson's testimony that defendant had a fresh cut above his eye; 2) Sergeant Davis's testimony concerning the cut above defendant's eye; 3) Sergeant Davis's testimony that, according to defendant, "a female had cut him or scratched him in the eye;" 4) Officer Kennington's testimony that Hanley exhibited no injuries; 5) the arraignment transcript in which defendant explained that he held Hanley down to prevent further injury—as partially corroborated by Kennington's testimony that defendant held Hanley down; 6) Lashock's and Kennington's testimony suggesting that Hanley and defendant were engaged in an argument prior to defendant's arrest—as also supported by Hanley's March 20, 2018, statement to police; and 7) Hanley's testimony that she had been the primary aggressor in a past altercation involving defendant. Given the amount of evidence supporting a theory of self-defense, it is clear that defendant was entitled to a self-defense jury instruction at trial. *Lewis*, 2015 IL App (1st) 122411, ¶ 56.

¶ 53   Accordingly, Heckinger's failure to tender such an instruction was unreasonable, unless his nonperformance could be attributed to trial strategy. *Haynes*, 408 Ill. App. 3d at 689. Here, however, we find that Heckinger's decision to forgo any jury instruction could not be attributed to trial strategy.  During his testimony for defendant's amended motion for a new trial, Heckinger repeatedly recognized the applicability of a self-defense instruction as supported by the State's evidence. Still, he completely deferred to defendant on the matter:

> "[Defendant] has experience in the criminal law system, and as a result of that he had specific ideas as to what should and shouldn't be presented, how it should be presented, and when it should be presented, and he did not agree with me as to the idea of any affirmative defenses such as self-defense or anything like that."

Heckinger also noted that defendant "brushed *** aside" any discussions as to jury instructions.

From his testimony, it is plain to see that Heckinger's refusal to tender a self-defense jury instruction did not result from any analysis as to the applicable law and facts in this case. Instead, it resulted solely from a desire to placate defendant, without any regard to defendant's prospects at trial. Accordingly, we find that Heckinger's decision to forgo tendering a self-defense jury instruction was not a matter of trial strategy, meaning his choice to avoid tendering the instruction, which he knew was appropriate, was objectively unreasonable. *Id.*

¶ 54    Nonetheless, the State argues that Heckinger's decision was part of his strategy to argue "that [defendant] never touched the victim." To this point, the State posits, "[Heckinger] concluded that a self-defense theory was incompatible with the theory presented, since it required defendant to admit to the conduct charged." This argument is inconsistent with Heckinger's own testimony and relies on a strained interpretation of the record. As discussed above, Heckinger did not testify at the hearing on the amended motion for a new trial that his strategy was to deny contact between defendant and victim. Instead, he deferred the decision to defendant, without any regard to the applicable law or facts in this case. During Heckinger's opening statement and closing argument, he did not argue that defendant "never touched the victim." While he did note in his closing argument that Hanley—who was one of the State's witnesses—"testified that [the domestic battery] didn't take place," Heckinger did not indicate to the jury that he was adopting her stance as his own. Instead, he recognized Hanley's conflicting testimony to suggest that the State failed to carry its burden in proving defendant's guilt beyond a reasonable doubt. Heckinger asked Hanley whether defendant ever touched her, but he did not call any of his own witnesses to establish that defendant had not touched Hanley. Under these circumstances, we believe it strains credulity to suggest that Heckinger's theory of the case was to simply deny that any contact had occurred between defendant and Hanley.

¶ 55    The State seemingly disagrees, taking great import in the fact that, at the hearing on his amended motion for a new trial, defendant testified that he "did not put [his] hands on" Hanley. According to the State, defendant's statement—which was made over a full year after trial had been completed—further evinced Heckinger's supposed trial strategy to deny contact.

¶ 56    We reject this argument. We first note that the State's argument relies on misleading, cherry-picked language. When taken in context, defendant's statements that he did not "hit" Hanley or "put his hands on [her]" seem to be reiterations that he did not physically strike her, not that he did not hold her down and restrain her, meaning his statements were not necessarily inconsistent with a self-defense instruction.  Furthermore, while defendant did later suggest that he did not place his hands on Hanley, he had earlier stated at the March 20, 2018, hearing that he held down Hanley to prevent her from scratching him. The State gives this earlier statement— which was read to the jury—no weight while divining Heckinger's strategy. Either way, we do not see how either of defendant's statements are indicative of Heckinger's trial strategy, especially when Heckinger's testimony suggested that he and defendant disagreed as to the utility of any affirmative defenses. Perhaps most importantly, even if it were true that Heckinger's trial strategy was to suggest that defendant never touched Hanley, defendant was still entitled to a self-defense instruction, unless there was a specific, strategic reason to forgo requesting the instruction. *Everette*, 141 Ill. 2d at 156. We find no such reason in the record.

¶ 57    The State also places great import in the fact that, according to Heckinger's testimony from the amended motion for a new trial, defendant "expressly rejected" pursuing a theory of self-defense. Accordingly, the State argues that "[Heckinger] was under no obligation to pursue a trial strategy that involved admitting the offense in light of his client's clear rejection of it." We disagree. As both parties recognize, it is defense counsel's decision alone whether to assert an

affirmative defense such as self-defense. *People v. Edmondson*, 2018 IL App (1st) 151381, ¶ 40. Accordingly, Heckinger had no obligation to defer to defendant's judgment on the matter, especially when he had acknowledged that a self-defense instruction would be applicable, and where a self-defense theory was not necessarily inconsistent with defendant's core claim that he did not hit Hanley or act as an aggressor. *Id.*

¶ 58    Having found that Heckinger's failure to request a self-defense instruction was objectively unreasonable, we further find that defendant was prejudiced by Heckinger's ineffective representation. Again, to prevail on a claim of ineffective assistance of counsel, a party must show that, but for trial counsel's unreasonable performance, there is a "reasonable probability" that the result of the trial would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687).

¶ 59    For purposes of establishing the second prong under *Strickland*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. 466 U.S. at 694. In determining whether the result of a trial would have been different but-for counsel's ineffective assistance, "[a]bsolute certainty is not required. Rather, a 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome' [citation], and a probability may be reasonable even if the chance of a different result is less than 50%." *People v. Petrie*, 2021 IL App (2d) 190213, ¶ 80 (citing *Strickland*, 466 U.S. at 694; *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008)).

¶ 60    Here, defendant was prejudiced by Heckinger's deficient performance. At trial, the lack of any self-defense instruction rendered the totality of the State's evidence as to count I particularly damning. Officer Kennington testified that he witnessed defendant leaping onto Hanley and holding her down. Additionally, the State presented the jury with the arraignment transcript, in

which defendant admitted to holding down Hanley—as corroborated by Kennington's testimony. Furthermore, although Hanley's testimony was rife with contradictions, the jury was made aware of her March 20, 2018, written statement to police, in which she claimed that defendant grabbed her around her neck, pushed her into the couch, and struck her left ear. Officer Johnson testified that he completed the report with Hanley and suggested that she verified its accuracy before signing the statement. Furthermore, the jury was made aware of defendant's very recent indictment for domestic battery in case No. 18-CF-527, in which Hanley was also apparently the victim, which was admitted into evidence without any limiting instruction. Because the jury was unable to consider whether defendant was justified in making the contact with Hanley pursuant to a theory of self-defense, the jury was virtually guaranteed to find defendant guilty of the domestic battery charge.

¶ 61    On the other hand, a self-defense instruction would have provided the jury with an alternate lens through which to view the State's evidence. For instance, had the jury been instructed on self-defense, it could have found that, as he described in the arraignment transcript, defendant held down Hanley only because she had already scratched his face and he was afraid she would attack him again. Officer Kennington's testimony—which was particularly devastating for defendant's case—could have corroborated this version of events, as he saw defendant hold Hanley's arms down, consistent with the arraignment transcript. Thus, a self-defense instruction could have effectively negated the State's most critical evidence against defendant. While the hypothetical instruction would have conflicted with the portions of Hanley's testimony in which she denied any contact whatsoever with defendant, her testimony was already suspect, as it also conflicted with her recanted written statement, as well as Officer Johnson's and Officer Kennington's testimonies.

¶ 62    Indeed, the evidence adduced at trial could have reasonably enabled a jury to find the

various elements of self-defense, in that: 1) unlawful force was threatened against defendant when Hanley scratched him in the face, as suggested by the arraignment transcript and Johnson's and Davis's testimonies that defendant had been injured; 2) Hanley—and not defendant—was the aggressor, as suggested by the arraignment transcript, Kennington's testimony that Hanley lacked any injuries, and Johnson's and Davis's testimony concerning defendant's wounds; 3) a danger of harm was imminent, as Kennington testified that defendant and Hanley continued to argue moments before defendant's arrest; 4) holding down Hanley was necessary to prevent further injury, as suggested by the arraignment transcript; 5) defendant subjectively believed a danger existed requiring him to hold down Hanley's arms, as suggested by the arraignment transcript; and 6), defendant's beliefs as to any danger were reasonable, as evinced by the various evidence suggesting that defendant had already been scratched, and because Hanley had admitted to previously being the aggressor in the confrontation precipitating case No. 18-CF-527. Because there is a reasonable probability that a jury could have found that defendant was defending himself against Hanley, we hold that defendant was prejudiced by Heckinger's deficient performance.

¶ 63　The State argues that "defendant could not have been prejudiced by the absence of the instruction because the evidence against him was overwhelming." In support of this argument, the State points to the evidentiary strength of Hanley's written police statement and Officer Kennington's testimony.

¶ 64　While Hanley's written statement was detrimental to defendant's case, the State exaggerates the probative value of the written statement, which Hanley later recanted. Like her testimony, portions of the written statement conflicted with other evidence adduced at trial. None of the testifying officers saw defendant grab Hanley her by the neck, throw her on the couch, or strike her, as provided in the written statement. Kennington did not notice any injuries on Hanley's

person, despite the fact that she had purportedly been thrown by her neck and struck in her ear moments earlier. Furthermore, if the jury had been instructed on self-defense, it may have found that Hanley's written statement was self-serving and vindicative, reasoning that she failed to mention scratching defendant because she did not wish to incriminate herself. After all, through the introduction of Officer Johnson's testimony, the State had already thoroughly called Hanley's credibility into question.

¶ 65    Furthermore, as we have already suggested, a jury could have found that Kennington's testimony supported a theory of self-defense if it had been instructed on the affirmative defense. At worst, because Kennington was not present to see what transpired before defendant held Hanley down, his testimony does not necessarily contradict a theory of self-defense.

¶ 66    To further demonstrate the lack of prejudice resulting from Heckinger's performance, the State also adopts the trial court's reasoning in denying defendant's amended motion for a new trial, arguing that, "even if [Hanley] had caused the cut above defendant's eye, it would have resulted from an earlier incident and defendant was no longer defending himself from being attacked, but [was] acting as the aggressor." In other words, the State suggests that, even if Heckinger had tendered a self-defense instruction to the jury, the jury would have found that no imminent threat existed at the time defendant held Hanley down, because too much time had lapsed since Hanley scratched defendant.

¶ 67    We disagree and find that the trial court's determination was against the manifest weight of the evidence. Again, in order to establish a claim of self-defense, a defendant must show, among other things, that a danger of harm was imminent. *Lee*, 213 Ill. 2d at 224. For purposes of self-defense, "imminent" means "present," "immediate," or "reasonably probable," but not "merely possible." *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 25 (citing *People v, Robinson*, 375

Ill. App. 3d 320, 336 (2007)). "The right of self-defense does not justify a person in committing an act of retaliation or revenge [citation], nor does the right permit a person to pursue and inflict injury upon an initial aggressor after the aggressor abandons the altercation." *People v. Dillard*, 319 Ill. App. 3d 102, 106 (2001). However, "[i]f [a] defendant responds to a confrontation with such excessive force that he is no longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually started the confrontation." *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58. A defendant cannot successfully claim self-defense where the aggressor has been disabled or disarmed. *People v. Chatman*, 102 Ill. App. 3d 692, 700 (1981).

¶ 68     Here, based on the evidence adduced at trial, a jury could have found that defendant was in imminent danger prior to holding down Hanley. Accordingly, there is a reasonable probability that the result of defendant's trial would have been different had Heckinger tendered a self-defense instruction. Again, when Kennington first described entering the Key residence, he stated that he heard a "commotion," consisting of "yelling" and "arguing." Because an argument necessarily requires two people, it can be inferred that he heard defendant and Hanley yelling at one another. As suggested by the arraignment transcript and Sergeant Davis's testimony, at some point during this argument, Hanley purportedly scratched defendant over his eye. Although Kennington first testified that he only saw defendant yelling at a "shocked" Hanley the moment he entered the living room, he also agreed on cross-examination that the two were "yelling at each other" when he "came into the living room," establishing that the argument—which had already turned violent— had not ended. Kennington did not testify as to the amount of time that passed between the "commotion" he heard and the moment in which defendant leapt on Hanley. However, Johnson noted that defendant's wound was still bleeding after his arrest, suggesting that Hanley had

scratched him very recently. Defendant and Hanley still appeared to be within arm's length of one another when Kennington entered the room, and Hanley was neither disarmed nor disabled prior to defendant pinning her down on the couch. She had already acknowledged to the jury that she had been the aggressor in a previous altercation involving defendant. All of these facts cut against the trial court's finding that defendant acted in retaliation when pinning Hanley down. To this point, a jury could have also found that defendant's contact with Hanley was proportionate to any threat of being scratched once again, further belying the trial court's finding of retaliation. *Holman*, 2014 IL App (3d) 120905, ¶ 58.

¶ 69 Given this evidence, we find that, had the jury been instructed on self-defense, it could have reasonably found that defendant was in imminent danger as necessary to support a self-defense theory. *McLennon*, 2011 IL App (2d) 091299, ¶ 25; *Holman*, 2014 IL App (3d) 120905, ¶ 58. Accordingly, we hold that a reasonable probability exists that the trial would have resulted differently had the jury been instructed on self-defense, meaning defendant was prejudiced by Heckinger's deficient performance.

¶ 70                                    III. CONCLUSION

¶ 71 For the reasons stated, we reverse the judgment of the circuit court of Winnebago County's March 25, 2020, order denying defendant's amended motion for a new trial as well as defendant's domestic battery conviction. We remand the proceedings for a new trial.

¶ 72 Reversed and remanded.