2025 IL App (2d) 240324-U
No. 2-24-0324
Order filed March 10, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 23-CF-134 |
| JOHN W. BEYER, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Trial counsel was not ineffective for failing to seek a self-defense instruction where defendant's aggression provoked the physical altercation during which he committed the alleged domestic abuse.

¶ 2   Defendant, John W. Beyer, appeals from his conviction of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2022)).  He contends that, because the victim was the initial aggressor, his trial counsel was ineffective for failing to seek a jury instruction on self-defense.  Because the evidence did not support several elements of self-defense, counsel was not ineffective for failing to seek the instruction; thus, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State indicted defendant on two counts of domestic battery based on his having knowingly made physical contact of an insulting or provoking nature by pushing two family members: his son Co.B. and mother, Linda Beyer.  The indictment alleged that defendant had a prior conviction of domestic battery in case No. 16-CM-213.

¶ 5     Before trial, defendant's counsel filed a notice that defendant would assert the affirmative defense of justifiable use of force (see 720 ILCS 5/7-1, 7-14 (West 2022)).  Also, the trial court granted the State's pretrial motion to introduce, as propensity evidence (see 725 ILCS 5/115-7.4(a) (West 2022)), defendant's prior domestic battery conviction in case No. 16-CM-213.  The conviction was based on defendant having placed his hands around Co.B.'s neck.

¶ 6     Also, before trial, defense counsel engaged in plea discussions on behalf of defendant.  At one point, counsel advised the trial court that he had met with defendant regarding a plea offer from the State.  On another occasion, counsel obtained a continuance so that defendant could consider a possible plea.

¶ 7     On the first day of trial, before jury selection began, the trial court noted that it was told that defendant was refusing to wear street clothes during the trial.  Defendant responded, "I'm fine with what I have," meaning his jail-issued orange uniform.  After the court explained to defendant that his orange uniform would convey to the jury that he was in custody, defendant responded, "That's okay, your Honor."  When the court asked defendant why he wanted the jury to know he was in custody, he answered, "I think it would work better for me.  That's just my hunch I'm going with."  Defendant added that he "like[d] the shackles and handcuffs" and that "[i]t work[ed] better for [him]."  When the court asked defendant if he wanted more time to talk with defense counsel about putting on street clothes, defendant answered that talking with counsel would not change his

mind. Defense counsel then reminded the court that there had been an order allowing defendant to wear street clothes and that the public defender was offering to provide him such clothes. Counsel added that wearing the jail uniform was against his advice but defendant had chosen to do so. Counsel further suggested that it was unnecessary to keep defendant shackled during the trial. The court agreed and asked defendant if the fact that he would be unshackled during the trial changed his mind about wearing his jail uniform. Defendant said no. The court remarked that, if defendant changed his mind before the jury was brought in, the court would give him time to change into street clothes. Defendant acknowledged the offer.

¶ 8      The following facts were developed at defendant's jury trial. Ch.B., defendant's younger of two sons, testified that on March 30, 2023, he was living in a two-story house in Newark with his mother, his older brother Co.B., his sister, Linda (his grandmother), and defendant. At around 8 p.m. that evening, Ch.B. was playing a video game in his bedroom on the first floor. At that time, he "heard [defendant] going through [Linda's] purse." When defendant walked by Ch.B.'s room, Ch.B. told him to "stay out of [Linda's] stuff." According to Ch.B., defendant told him to "mind [his] damn business." Defendant then slammed Ch.B.'s door, and Ch.B. told him not to do that. After defendant sarcastically apologized, Ch.B. walked out of his room and again told defendant not to slam his door.

¶ 9      In response, defendant picked up a "dog cage,"[1] held it over his head, and told Ch.B. that if he did not "shut [his] f*** mouth, [he was] going to bash [the cage] over [Ch.B.'s] skull." At the time, Ch.B. was standing only inches from defendant just outside Ch.B.'s bedroom. Ch.B.

_____

[1]The witnesses variously described the item as a "dog cage," "kennel," "crate," or "gate." For simplicity, we will refer to it as a cage.

denied that he had hit defendant, or threatened to do so, before defendant threatened him with the cage. Ch.B. testified that he was pleading with defendant not to hit him with the cage. Defendant faked as though he were going to hit Ch.B. with the cage, then threw it behind a couch.

¶ 10    During Ch.B.'s confrontation with defendant, Co.B. came downstairs and asked what was happening. According to Ch.B., defendant started a physical altercation with Co.B. by approaching and pushing him. The two then started shoving each other, and defendant "hit" Co.B. Asked how defendant "hit" Co.B., Ch.B. testified that defendant "went like towards [Co.B.'s] neck area." At that point, Ch.B. tried to pull defendant off Co.B., and defendant reacted by turning and striking Ch.B. in the eye and arm. When defendant struck him, Ch.B. began to fear for his life. Nonetheless, he still tried to intervene between defendant and Co.B.

¶ 11    The fight between defendant and Co.B. continued as defendant began shoving Co.B. into the adjoining laundry room and telling him to get out of the house (the laundry room had an outside door). According to Ch.B., Co.B. kept telling defendant to stop. At one point, Linda entered the laundry room through the outside door. Linda tried to get between defendant and Co.B. and stop the fight. Defendant then shoved both Co.B. and Linda to the floor. Defendant also threw a garbage can at Co.B. and Linda. Ch.B., "in fear for [his] life," retreated to his bedroom and called 911. When Ch.B. returned to the laundry room while still on the phone, defendant threw a glass coffee pot at Ch.B.'s feet, shattering the pot. Ch.B. then left the house while still on the phone. When he got outside, he saw that Co.B. was also on the phone. Eventually, the police arrived.

¶ 12    Co.B. testified that on March 30, 2023, he lived in Newark with his siblings, his mother, Linda, and defendant. At around 8 p.m. on that date, he was in his upstairs bedroom when he heard Ch.B. screaming downstairs. Ch.B. was telling defendant "to stop going through [Linda's] stuff" and to "get out of [Ch.B.'s] face."

¶ 13    When Co.B. went downstairs, defendant and Ch.B. were standing face to face in the living room.  Defendant was "screaming at the top of his lungs" and threatening to smash the dog cage over Ch.B.'s head.  Co.B. stood in the kitchen and "scream[ed] some profanities" at defendant; he asked him, "what the f*** are you doing to my brother[?]"  As he swore at defendant, Co.B. was about five to ten feet away and did not move toward defendant or threaten him in any way.  He swore at defendant because he feared defendant would hurt Ch.B. with the cage.  Defendant eventually put down the cage without hitting Ch.B.

¶ 14    When Co.B. was asked what defendant did "physically" to him, he answered:

> "A. He came at me and grabbed me and he was trying to throw me out of the house.
>
> Q. Where did he grab you?
>
> A. My neck.
>
> Q. And you—
>
> A. And he kept trying to push me.  He wasn't trying to physically strangle me.  He was just trying to push me and fight.
>
> Q. When he grabbed you, he came over to you; is that correct?
>
> A. That's correct.  And as soon as he approached me, I punched him directly in the face.  ***."

Co.B. further testified:

> "Q. Once [defendant] started coming towards you, did you go towards him in any way?
>
> A. No.  I stood my ground.  I stayed in the kitchen.  As he approached me is when I threw my punch.
>
> Q. And what was he doing when you threw your punch?

A. He was trying to grab me, sir.

Q. And that was by the neck as you described earlier?

A. Yes."

¶ 15 Co.B. testified that, after he punched defendant, they "scuffle[d]" in the kitchen. Ch.B. was "attacking [defendant's] back" while Co.B. was throwing punches "trying to get [defendant] off [him]." After about a minute, the fight moved into the nearby laundry room. Linda then came in from doing yardwork and tried to intervene. During the continued scuffle, defendant pushed both Co.B. and Linda to the floor. Defendant then grabbed a garbage can and threw it at Co.B. and Linda. Co.B. could not recall if the garbage can hit either him or Linda. Defendant then grabbed a glass coffee pot and threw it at Ch.B., striking his foot. The pot shattered, and glass went everywhere.

¶ 16 Co.B. then took Linda outside and called 911. He did so because he felt that "[their] lives were in danger at that moment." While waiting outside for the police, Co.B.'s and Ch.B.'s mother came home. Co.B. told her what had happened. Shortly thereafter, the police arrived.

¶ 17 Co.B. testified that he had scratches on his neck from where defendant had grabbed him. The police took photographs of his neck. Co.B. identified a photograph as a true and accurate depiction of the scratches on his neck. He denied having the scratches before the incident.

¶ 18 According to Co.B., defendant was arrested in 2016 for domestic battery against him. Co.B. identified documents reflecting defendant's 2016 plea of guilty to domestic battery in which he placed his hands around Co.B.'s neck.

¶ 19 On cross-examination, Co.B. acknowledged that he saw defendant hold the dog cage over his head but never saw him hit Ch.B. with the cage. He reiterated that he and defendant were having a verbal altercation when defendant "proceeded to come at [him]," at which point Co.B.

punched defendant in the face. According to Co.B., defendant pushed both him and Linda while the three were in the laundry room. He saw defendant use both hands to push Linda "[a]round [her] chest, shoulder area."

¶ 20    Recordings of Ch.B.'s and Co.B.'s 911 calls were admitted into evidence and played for the jury. Each was breathing heavily as he urgently reported that defendant was acting "crazy," "attacking" family members, and throwing objects.

¶ 21    Linda testified that it was difficult to testify against her son and that she was doing so under the State's subpoena. She stated that, late in the evening on March 30, 2023, she was outside with her dog when she heard screaming inside the house. She went inside immediately.

¶ 22    Once inside, she saw Co.B. and defendant "at the kitchen sink together wrestling." Co.B. was yelling "stop, stop it." Linda unsuccessfully tried to separate the two and "make it peaceful." Defendant tried to push Co.B. out the back door of the house and said he wanted Co.B. to leave. Linda, standing behind defendant, told him, "If anybody needs to leave, you need to leave." At that point, defendant "just kind of pushed—moved his arm back and then [Linda] fell against the floor and hit the register." Linda could not recall which part of her body defendant's arm hit. When asked if she was injured, Linda said she was "just sore, shooken [*sic*] up."

¶ 23    Linda testified that, at some point, she, Co.B., and Ch.B. left the house. Shortly thereafter, the police arrived.

¶ 24    On cross-examination, Linda testified that, when defendant reached back, he did not touch her with both hands. Nor did he "push [her] in [her] shoulders."

¶ 25    On redirect, when asked if she recalled telling the police that "[her] son threw [her] to the ground," Linda said she could not recall her "exact words." She acknowledged, however, that she said "threw me to the ground" on one of the 911 calls that was played in court. She denied having

difficulty recalling the events because she did not want anything bad to happen to defendant. The State then asked, "If [defendant] threw you to the ground, why did you not want him to be charged with a criminal offense?" She answered, "Because there had been several calls and police had been coming to my house four or five different times and never taking [defendant], and I was confused why they wouldn't take him before or anything." According to Linda, she "fell to the ground," which was "different than being thrown to the ground." She admitted that she wanted defendant to leave the house after the incident.

¶ 26 Deputy John Cady of the Kendall County Sheriff's Office testified that he responded to the house to investigate a possible domestic disturbance. When he arrived, he observed Co.B., Ch.B., and Linda standing outside the house. Cady was told that defendant was inside the house.

¶ 27 Upon entering the house, Cady saw a "big mess on the floor in between the kitchen table and the counter,*** [and] a coffee pot broken on the floor, coffee grounds strewn about, there was glass everywhere, and [defendant] was in the process of trying to clean it up." Defendant was eventually arrested.

¶ 28 According to Cady, when he saw Linda outside, she was wearing only one shoe and was limping. Cady took photographs of Co.B. that showed scratch marks on the side of his neck. Cady did not observe any physical injuries on defendant.

¶ 29 On cross-examination, Cady testified that he saw a dog gate, not a kennel, just inside the doorway.

¶ 30 Defendant did not offer any evidence.

¶ 31 In closing argument, the assistant state's attorney remarked:

"Now, I want to make no mistake about it, ladies and gentlemen, this is not a self defense case. In fact, you are going to be given instructions by the judge shortly and in

none of those instructions are you going to be instructed as to self defense. You are not going to get it because this is not a self defense case.

In fact, the judge is going to give you the instructions as to what exactly domestic battery is and what the State needs to prove for us to prove guilty beyond a reasonable doubt. That's going to come—"

Defendant interjected, "That's false," and then launched into a profane tirade against the prosecutor. The trial court sent the jury out of the courtroom while it admonished defendant. When the jury returned, the prosecutor finished his argument, advising the jury of the offense elements and stressing that there would be no self-defense instruction.

¶ 32 In defendant's closing, counsel argued, among other things, that the testimony of defendant's family members was "suspect" and inconsistent. Counsel noted that Ch.B. and Co.B. described a "dog kennel," but Deputy Cady described the item as a "dog gate." Counsel stressed that the first physical contact during the incident was when Co.B. punched defendant in the face. Counsel further argued, based on Linda's testimony, that defendant did not knowingly make physical contact with her. Counsel also noted that Co.B. contradicted Linda's account of the physical contact that led to her fall. Counsel concluded that the State did not meet its burden of proof as to either count. Counsel did not argue self-defense.

¶ 33 The State's rebuttal argument was given by the Kendall County State's Attorney himself, who disagreed with the assistant state's attorney on one point:

"What you may be asking, ***, wait a minute, didn't [Co.B.] hit [defendant] first? Good question. He did. Why? Because the defendant came at him and what does he know about the history of his father? More than anyone in this room. His father has been violent

to him before. So what is he supposed to do? Is he supposed to wait like he did in 2016? I submit to you what he did was actually what he should do.

So I disagree a little bit with my own prosecutor. It is a self defense [case], but for [Co.B.]. Not for the defendant. And that's why you are not seeing an instruction that says that the defendant was justified in the use of force that he did to protect himself or others. That's self defense."

¶ 34 Defendant tendered no instruction on self-defense. The jury found defendant guilty of domestic battery as to Co.B. but not guilty as to Linda. The trial court sentenced defendant to three years' imprisonment, and defendant filed this timely appeal.

¶ 35                                II. ANALYSIS

¶ 36 On appeal, defendant contends that his trial counsel was ineffective for failing to seek a self-defense instruction.

¶ 37 To determine whether a defendant was denied his right to the effective assistance of counsel, we first decide whether counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, we must decide whether the defendant was prejudiced by the deficient performance such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is one sufficient to undermine confidence in the outcome; that is, counsel's deficient performance must have rendered the result of the proceeding unreliable or fundamentally unfair. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffectiveness. *Enis*, 194 Ill. 2d at 377.

¶ 38 "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16, *overruled on other grounds by People v. Ramirez*, 2023 IL 128123, ¶¶ 19, 24. "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence and, therefore, are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *Falco*, 2014 IL App (1st) 111797, ¶ 16.

¶ 39 Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt not only all the elements of the charged offense, but also that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The elements of self-defense are (1) that unlawful force was threatened against a person, (2) that the person threatened was not the aggressor, (3) that the danger of harm was imminent, (4) that the use of force was necessary, (5) that the person threatened actually and subjectively believed a danger existed that required the use of force applied, and (6) the beliefs of the person threatened were objectively reasonable. *Lee*, 213 Ill. 2d at 225.

¶ 40 To warrant an instruction on self-defense, there must be "some evidence in the record which, if believed by a jury, would support a claim of self-defense." *People v. Everette*, 141 Ill. 2d 147, 157 (1990). Specifically, "the defendant must establish some evidence of each of the *** elements" of self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). The defendant is entitled to the instruction even where the evidence of self-defense is "slight [citations] or where it is inconsistent with [the] defendant's own testimony." (Internal quotation marks omitted.) *Everette*, 141 Ill. 2d at 156. "In applying this test, the court must consider the evidence in the light most favorable to the defendant." *People v. Alexander*, 250 Ill. App. 3d 68, 76 (1993). The failure to

request a particular jury instruction can be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission denied the defendant a fair trial. *Falco*, 2014 IL App (1st) 111797, ¶ 16.

¶ 41 Defendant was charged with pushing Co.B. to the floor. The evidence was undisputed that this act occurred in the kitchen after Co.B. came downstairs. However, there was not even slight evidence to suggest that defendant pushed Co.B. in self-defense. The proof was lacking on at least two elements of self-defense: (1) that defendant was not the aggressor and (2) that unlawful force was threatened against him. The evidence clearly showed that defendant's aggression spurred the physical altercation during which he pushed Co.B. The incident began when Ch.B. told defendant not to slam his bedroom door, to which defendant responded by picking up a dog cage and threatening to slam it on Ch.B.'s head. Ch.B. pleaded with defendant not to hit him with the cage. Defendant faked as though he were going to strike Ch.B., then threw the cage behind a couch.

¶ 42 When Co.B. heard the verbal altercation, he came downstairs and saw Co.B. and Ch.B. standing face to face. According to Co.B., defendant was "screaming at the top of his lungs" and threatening to smash the cage over Ch.B.'s head. Co.B. swore at defendant and asked him what he was doing. Defendant set the cage down, but then engaged in a physical altercation with Co.B. Ch.B. and Co.B. gave divergent accounts of who made the first physical contact. Ch.B. testified that defendant initiated the contact by pushing Co.B., but Co.B.'s version was that defendant "came at [him]" and he reacted by punching defendant. However, even if Co.B. initiated the physical contact by punching defendant, that action was not unlawful force but a reasonable response to defendant's menacing conduct. Defendant was enraged and had just threatened Ch.B. with the dog cage. Moreover, Co.B. believed that defendant was trying to "grab" him by the neck,

and his apprehension was justified given defendant's prior conviction of domestic battery for placing his hands around Co.B.'s neck.

¶ 43 Having provoked Co.B.'s use of force against him, defendant could not claim self-defense unless he (1) exhausted every reasonable means to escape imminent danger of great bodily harm or (2) withdrew from physical contact and indicated a desire to terminate the use of force. See 720 ILCS 5/7-4(c) (West 2022). There was no evidence that defendant fulfilled either of these conditions. He did not attempt to disengage from the ensuing physical altercation with Ch.B. and Co.B., which eventually involved Linda. Defendant disregarded calls for him to stop as well as Linda's attempts to separate him from Co.B. Nor was he in danger of great bodily harm; to the contrary, he was the one who resorted to throwing objects such as a glass coffee pot. He put both Ch.B. and Co.B. in fear for their lives. Based on all the circumstances, when defendant pushed Co.B. down, defendant was the aggressor and had not been subjected to unlawful force.

¶ 44 Thus, even when viewed in the light most favorable to the defendant, evidence was lacking on two elements of self-defense. Therefore, trial counsel's choice not to pursue a self-defense instruction was within the bounds of reasonable professional judgment. Counsel pursued the only viable defense theory, which was that the testimony of defendant's family members did not satisfy the elements of domestic battery. Indeed, that argument prevailed as to Linda—the jury found defendant not guilty of domestic battery for allegedly pushing her down.

¶ 45 Defendant's reliance on *People v. McFern*, 2022 IL App (2d) 200329-U, is misplaced. In *McFern*, the defendant, who had been convicted of domestic battery, argued that his trial counsel was ineffective for failing to request a self-defense instruction. *McFern*, 2022 IL App (2d) 200329-U, ¶ 48. The officer dispatched to the defendant's mother's residence for a " 'medical assist' " saw the defendant leaning over and yelling at the victim as she sat on a couch; the officer

then saw the defendant jump on top of the victim and hold her down. *McFern*, 2022 IL App (2d) 200329-U, ¶ 10. The victim testified that the authorities were called to the residence because the defendant's mother had fallen down some stairs; the victim denied that the defendant yelled at or placed his hands on her, and she repudiated her written statement, in which she accused the defendant of yelling at her, grabbing her by the throat, pushing her down on the couch, and punching her in the head. *McFern*, 2022 IL App (2d) 200329-U, ¶¶ 13-14. We found that "[n]umerous portions of the State's evidence supported [a self-defense theory]," including that (1) the police observed that the defendant appeared to have a fresh cut above his eye, (2) the defendant told the police that the victim had cut or scratched his eye, (3) the victim had no apparent injuries, (4) the defendant stated at his arraignment that he had tried to hold the victim down to prevent further injury to himself (as was partially corroborated by the responding officer's testimony that he saw the defendant hold the victim down), and (5) the victim testified that she had been the primary aggressor in a prior altercation with the defendant. *McFern*, 2022 IL App (2d) 200329-U, ¶ 52. Based on that evidence, we concluded that the defendant would have been entitled to a self-defense instruction, and we further found that trial counsel had no strategic reason for not seeking the instruction but had simply deferred to the defendant's wishes. *McFern*, 2022 IL App (2d) 200329-U, ¶ 53.

¶ 46 In *McFern*, the defendant's conduct was ambiguous enough to permit a self-defense argument. By contrast, the conduct at issue here—defendant's pushing Co.B. down—occurred during an altercation that defendant provoked by menacing Co.B., whom he had battered on a prior occasion. *McFern* is distinguishable and does not support defendant's argument.

¶ 47 Moreover, even if trial counsel was deficient in failing to seek a self-defense instruction, defendant was not thereby prejudiced. Given the extensive evidence of defendant's aggressive

behavior, it was not reasonably likely that the jury would have found that he was defending himself when he pushed Co.B. down as charged. We conclude that trial counsel was not ineffective for failing to seek a self-defense instruction.

¶ 48                                    III. CONCLUSION

¶ 49    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 50    Affirmed.